[No. B067514. Second Dist., Div. Three. July 29, 1994.]

JIMMEE SCOTT, a Minor, etc., Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

## COUNSEL

Manatt, Phelps & Phillips, Robert E. Hinerfeld and Ronald B. Turovsky for Defendants and Appellants.

Voorhies & Kramer, Gutierrez & Gutierrez and Jean Ballantine for Plaintiff and Respondent.

## OPINION

**CROSKEY, J.**—The County of Los Angeles (the County) and Zsa Zsa Maxwell, a children's services worker (CSW) in the County's department of children's services (DCS), appeal from the judgment of the superior court after a jury verdict. The jury awarded the seven-year-old plaintiff, Jimmee Scott, $1,191,692 in economic damages and $1,040,000 in general noneconomic damages, for a total of $2,231,692, for serious injuries she suffered as a result of the defendants' negligence in supervising her foster care. Jimmee had been placed in the home of her grandmother, Dorothy Bullock, under DCS supervision.[1]

The central issues raised by the appeal concern (1) the impact of requirements imposed upon local governments by regulations in the state Department of Social Services (DSS) Manual of Policies and Procedures (DSS Manual), (2) the extent to which shortfalls in local governments' budgets may or may not excuse performance of mandatory duties imposed by such regulations, and (3) the manner of apportioning fault where one or more

---

[1] Jimmee's complaint originally named as defendants the County, Maxwell, Bullock, Donald Walker, the CSW who supervised Jimmee's placements before her case was transferred to Maxwell, and Doe defendants. The complaint was later amended to name Clara L. Johnson, Ph.D. and her clinic, the Family Counselling Center of Inglewood. *Bullock did not appear in the action, and her default was entered.* Walker was dismissed from the action on the third day of trial. When we use the collective term "defendants," we refer only to the County and Maxwell.

defendants are sued for negligence, and the defendants' negligence consisted of failing to protect the plaintiff from the *intentional* acts of another defendant or a third party.

The DSS regulations at issue establish requirements for the supervision by county social service agencies of children placed in foster care under the agencies' supervision. In particular, when the events giving rise to this case took place, regulation 30-342 required *monthly* visits to be made to the home where each child is placed, subject to specific exceptions which are set forth in the regulation.[2]

Regulation 30-342, its successor regulation 31-320, and other regulations applicable to this case are regulations duly promulgated by the DSS pursuant to section 16501 of the Welfare and Institutions Code and impose mandatory duties upon local agencies.[3] We therefore hold that public entities are liable under section 815.6 of the Government Code for injuries to children in foster

---

[2] These regulations were originally set out in division 30 of the DSS Manual. They have since been renumbered to division 31. At all times relevant to this case, regulation 30-342 provided in pertinent part as follows: ".1 The social worker, . . . shall be present at the time of placement unless the child is placed out of state.

".2 The social worker shall monitor the child's physical and emotional condition, and shall take necessary action to safeguard the child's growth and development while in placement.

".3 For each child in placement the social worker shall:

".31 Have face-to-face contact at least monthly.

".311 The social worker shall be permitted to have less frequent face-to-face contact, up to a minimum of once each quarter, only if all of the following criteria are met:

"(a) The child has no severe physical or emotional problems caused or aggravated by the placement.

"(b) The placement is stable.

"(c) The case record documents the existence of at least one of the following circumstances:

"(1) The child is placed with a relative . . .

"(d) Written second-level supervisory approval has been obtained. . . .

".6 For the foster care provider(s), the social worker shall:

".61 Have contact at least monthly. . . ." (California-SDSS-Manual-SS, Manual Letter No. 85-74, effective Dec. 1, 1985; California-SDSS-Manual-SS, Manual Letter No. SS-88-03, effective May 28, 1988.)

Current regulation number 31-320 substantially includes the above provisions. (California-DSS-Manual-CWS, Manual Letter No. CWS-93-01, issued July 1, 1993.)

[3] In 1987, Welfare and Institutions Code section 16501 provided in pertinent part as follows: "As used in this chapter, 'child welfare services' means public social services which are directed toward the accomplishment of the following purposes: (a) protecting and promoting the welfare of all children, including handicapped, homeless, dependent, or neglected children; (b) preventing or remedying, or assisting in the solution of problems which may result in, the neglect, abuse, exploitation, or delinquency of children; (c) preventing the unnecessary separation of children from their families by identifying family problems, assisting families in resolving their problems, and preventing breakup of the family where the prevention of child removal is desirable and possible; (d) restoring to their families children who have been removed, by the provision of services to the child and the families; (e)

care which occur as a result of any violation of those duties;[4] such public entities and their employees are not immune under Government Code sections 815.2 and 820.2 for violations of those duties.[5] We also hold that functions performed by a county welfare agency pursuant to Welfare and Institutions Code section 16500 and following are separate and distinct from those quasi-prosecutorial functions in connection with proceedings under Welfare and Institutions Code section 300, which are commonly delegated to county welfare departments pursuant to Welfare and Institutions Code section 272.[6] Thus, a county and its employees are not immune under Government Code sections 815.2 and 821.6 for negligence in the performance of such functions.[7] Nor do shortfalls in government budgets excuse the performance of mandatory duties imposed by the regulations.

---

identifying children to be placed in suitable adoptive homes, in cases where restoration to the biological family is not possible or appropriate; and (f) assuring adequate care of children away from their homes, in cases where the child cannot be returned home or cannot be placed for adoption. Child welfare services may include, but are not limited to: case management, counseling, emergency shelter care, emergency in-home caretakers, temporary in-home caretakers, out-of-home respite care, teaching and demonstrating homemakers, parenting training, and transportation.

"The county shall provide child welfare services as needed pursuant to an approved service plan and in accordance with regulations promulgated by the department. . . ." (Stats. 1982, ch. 978, § 35, p. 3547.)

The version of section 16501 in effect in 1988 substantially included the above provisions (Stats. 1987, ch. 1353 § 4, pp. 4899-4900, operative Feb. 1, 1988), as does the current version.

[4]Government Code section 815.6 provides as follows: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty *unless the public entity establishes that it exercised reasonable diligence to discharge the duty.*" (Italics added.)

[5]Government Code section 815.2 provides as follows:

"(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.

"(b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

Government Code section 820.2 provides as follows: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

[6]Welfare and Institutions Code section 300 provides that children found to be abused, neglected, abandoned or otherwise in need of the care and protection which should be, but is not, being provided by their parents, may be made dependent children of the juvenile court under specified conditions. Welfare and Institutions Code section 272 provides that a county board of supervisors may delegate to a county welfare department all or part of the duties assigned to the probation officer under section 300 and sections which follow.

[7]Government Code section 821.6 provides as follows: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."

On the issue of apportionment of damages between one or more negligent defendants and a nonparty intentional tortfeasor, we hold that: (1) the jury's apportionment of damages was not supported by substantial evidence, and (2) the jury should have been instructed, pursuant to *Weidenfeller* v. *Star & Garter* (1991) 1 Cal.App.4th 1 [2 Cal.Rptr.2d 14], that a defendant may be found liable for noneconomic damages only in proportion to the total fault of all persons whose acts were a legal cause of the plaintiff's injuries, whether or not all such persons have appeared in the action, and whether their acts were intentional or negligent.

The jury found that Maxwell negligently failed to comply with regulation 30-342, and as a proximate result of Maxwell's negligence, for which the County is liable, Jimmee remained in an abusive and dangerous home where she ultimately was severely injured. The jury apportioned 1 percent of the fault to Bullock, and 99 percent to Maxwell and the County. Although we reject the defendants' claims of immunity, we do find the jury was not properly instructed on the apportionment of fault and that the court misapplied the collateral source rule. We therefore reverse the judgment and remand the matter for a redetermination of those issues.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Jimmee Scott was just under four years of age on June 28, 1988, the day on which her grandmother, Dorothy Bullock, immersed her legs in scalding water, inflicting deep burns that will leave Jimmee disabled and disfigured for life, and for which Bullock has been imprisoned for child abuse and corporal injury to a child.

Jimmee was in Bullock's care by order of the juvenile court and under the supervision of the DCS after she was abandoned by her mother, Latitia Bullock, approximately a year and a half before the date of her injuries.

On February 23, 1987, Jimmee's aunt, Debra Bullock, telephoned DCS, because Latitia had left Jimmee and Jimmee's five-year-old sister, Rickitia Canady, with her. Debra did not know where Latitia had gone, and she could not care for the children herself. The children's fathers, Jim Scott and Tyrone Canady respectively, were incarcerated, as was Latitia. The girls' case was placed into the County's "Emergency Response" program, "triaged," and assigned to CSW Donald Walker, one of the original defendants in this action, for response within three days.[8]

The next day, February 24, 1987, the County received a call from Bullock, saying Rickitia and Jimmee were now with her. On February 25, within the

---

[8]In 1987, regulations 30-130 and 30-132 of the DSS Manual required a county welfare agency to respond (1) immediately, (2) within three days, or (3) within ten days to any

assigned three-day response time, Walker met with Bullock and the girls in Bullock's home. Given the choice of whether to have Jimmee and Rickitia declared dependent children of the juvenile court, Bullock said she wished the court to take jurisdiction of the girls.

Subsequently, Walker located the girls' mother, Latitia, in jail. Latitia expressed concern about the children's placement with Bullock, stating Bullock was only interested in obtaining money for the minors. Still, she agreed the children could be placed with Bullock until she was released from jail.

On March 2, 1987, a hearing was held on the issue of whether Jimmee and Rickitia should be detained or released to Bullock or another relative. At the conclusion of the hearing, the case was transferred from the Emergency Response Program to Family Reunification. At a further hearing on March 9, the court signed a detention release order placing the children with Bullock under DCS supervision.

Walker, who continued to supervise Jimmee's placement, visited Jimmee and Rickitia on a monthly basis on March 26, April 28, May 20, and June 10, 1987. For two weeks, beginning May 26, Walker was on vacation. During his absence, Jimmee's aunt, Carla Heywood, telephoned DCS and advised a supervisor that she believed Bullock was using excessive discipline with the children, including leaving Jimmee on the toilet for three hours at a time and refusing to give her breakfast until 4 in the afternoon. This call was registered in the children's case log, and Heywood was assured that the matter would be investigated. Also recorded in the log was a complaint from Latitia that Bullock was mistreating the children.

Walker made an unannounced visit to Bullock's home on June 10, at which time he inquired about Bullock's discipline of the children. Bullock denied she used undue punishment. Nevertheless, Walker referred Bullock and the children to Dr. Clara Johnson for counseling and memorialized the referral in the case log.

After June 10, 1987, Jimmee's case was transferred to Maxwell. Maxwell testified at trial that she did not review the file and did not become aware of Heywood's allegations of excessive discipline.

requests or referrals for service which alleged that a child was endangered by abuse, neglect or exploitation. Immediate response was required if a law enforcement agency requested emergency response, or if any request or referral indicated the child was in imminent danger of physical pain, injury, disability, severe emotional harm or death. Response within ten days was required to requests or referrals alleging "general neglect," and response within three days was required for requests or referrals falling between those two extremes in level of urgency. (California-DSS-Manual-SS, Manual Letter No. 85-74, eff. Dec. 1, 1985, Regs. 30-130, 3-132.)

Dr. Johnson, to whom Walker referred Bullock and the children for counselling, was never made aware by DCS of the reason for the referral. Instead, Dr. Johnson was told by Bullock that the girls were referred for counselling because Jimmee was "acting out sexually" and needed to be evaluated for signs of sexual molestation. After interviewing the girls, Johnson found no indication of sexual abuse, and having no basis for investigating any other problems, determined the children were in a stable placement and in no danger. She so advised Maxwell on approximately August 18, 1987.

Maxwell's case log did not indicate any visits with Jimmee and Rickitia in Bullock's home before December 24, 1987, although she prepared a report for a judicial review of the children's status on November 24, 1987. Thereafter, Maxwell's entries in the log indicate face-to-face visits on January 13, February 22 and April 10. However, a handwriting expert testified that those entries appeared to have been made after June of 1988. Maxwell herself admitted she made the entries "possibly [in] June" of 1988.

Maxwell testified she did not visit Jimmee monthly, as required by the regulation 30-342 of the DSS Manual, because she had determined the placement was stable and did not require such intense supervision. However, under regulation 30-342, she was not authorized to make this determination without written authorization from her supervisor. No written authorization for a reduced schedule of face-to-face contacts appears in the service log.

In May of 1988, DCS received telephone calls from Carla Heywood expressing concern about Bullock's treatment of the children. In that same month DCS also received a call on a child abuse hotline from a neighbor, Louber Cole, who reported seeing Jimmee with two black eyes. Maxwell did not visit the children to investigate these calls, but instead merely telephoned Bullock, who assured her the children were in good condition and all was well. Maxwell did not mention the allegations of abuse by Heywood and Cole in her report to the juvenile court, filed May 24, 1988. After the hearing in which that report was received, Jimmee and Rickitia were placed in long-term foster care in Bullock's custody.

A month later, on June 25, 1988, Bullock immersed Jimmee's legs in scalding water and held her in that position for approximately 30 seconds as estimated by Jimmee's treating physician, causing burns which went through the skin, the fat under the skin, and the muscle, causing damage to the bone. Bullock did not take Jimmee for treatment until three days later, on June 28, 1988, by which time Jimmee was near death from severe infections caused by her burns.

In a criminal action, Bullock was convicted of two counts of child abuse and one count of inflicting corporal injury upon a child. In this action, in addition to receiving general instructions on negligence, legal cause and damages, the jury was instructed on the County's mandatory duties under Welfare and Institutions Code section 16501 and DSS regulation 30-342, *including the duty to have monthly face-to-face contact with each child in foster care and monthly contact with each foster care provider.* So instructed, and based upon all of the above evidence, the jury found the County and Maxwell, but not Dr. Johnson, liable for negligently failing to protect Jimmee from the severe abuse and injuries she received at the hands of Bullock. In a special verdict, the jury found that 1 percent of the negligence which was a legal cause of Jimmee's injuries was attributable to Bullock, 75 percent was attributable to the County, and 24 percent was attributable to Maxwell. This timely appeal followed.

## CONTENTIONS ON APPEAL

The defendants contend that: (1) the County and Maxwell are immune from liability for Jimmee's injuries under Government Code sections 815.2, subdivision (b), 820.2, and 821.6; (2) the court improperly took judicial notice that state DSS regulations impose mandatory duties upon the County; (3) the court erroneously precluded defendants from presenting evidence of severe budgetary constraints which prevented the County from employing sufficient caseworkers, thereby preventing the defendants from proving they exercised "reasonable diligence," within the meaning of Government Code section 815.6 to discharge mandatory duties to Jimmee; (4) the jury's apportionment of fault was not supported by substantial evidence; (5) the jury was misled by the special verdict as to the proper manner of apportioning fault; (6) the court erroneously excluded evidence of collateral source payments of Jimmee's medical expenses; and (7) the rate of postjudgment interest assessable against the County and Maxwell is 7 percent.

## DISCUSSIONS

1. *The County Is Liable to Jimmee Under Government Code Section 815.6, and the Defendants Are Not Immune From Liability Under Section 815.2, 820.2 or 821.6.*

Government Code section 815.6 provides that if a public entity has a mandatory duty imposed by an enactment that is designed to prevent a particular kind of injury, the entity is liable for an injury of that kind that is proximately caused by its failure to discharge the duty, unless the entity establishes that it exercised reasonable diligence to discharge the duty. (See

fn. 4, *ante*.) Jimmee contends that (1) DCS had a mandatory duty imposed by DSS regulation 30-342 to have face-to-face contact with Jimmee, her sister and Bullock at Bullock's home on a monthly basis; (2) the regulation was designed to prevent injury to children in foster care; (3) DCS failed to discharge its duty under the regulation; and, as a result, (4) DCS allowed Jimmee to remain in an abusive and dangerous situation in Bullock's home, where Jimmee ultimately suffered disabling and disfiguring injuries.

DCS and Maxwell contend they are immune from liability under Government Code sections 815.2, 820.2, and 821.6. Section 815.2 immunizes a public entity from liability arising from the acts of its employee where the employee is immune from liability; section 820.2 immunizes a public employee from liability for acts or omissions resulting from the exercise of the discretion vested in the public employee; and section 821.6 immunizes a public employee from liability for the institution or prosecution of judicial or administrative proceedings within the scope of his or her employment. (See fns. 5 and 7, *ante*.) We discuss each of these statutory provisions.

a. *Government Code Section 815.2.*

 Under Government Code section 815.2, subdivision (a), the County is liable for acts and omissions of its employees under the doctrine of respondeat superior to the same extent as a private employer. Under subdivision (b), *the County is immune from liability if, and only if, Maxwell is immune*. The sole bases under which it is claimed Maxwell is immune are the immunities for discretionary acts of government officials (Gov. Code, § 820.2) and prosecutorial immunity (Gov. Code, § 821.6). As the following discussion demonstrates, neither claim of immunity has any merit.

b. *Government Code Section 820.2.*

Section 820.2 of the Government Code provides that a public employee is not liable for an injury which results from the employee's act or omission in the performance of a discretionary function. (§ 820.2; *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 748 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]; *Ronald S.* v. *County of San Diego* (1993) 16 Cal.App.4th 887, 896 [20 Cal.Rptr.2d 418]; *Alicia T.* v. *County of Los Angeles* (1990) 222 Cal.App.3d 869, 882-883 [271 Cal.Rptr. 513].) However, the statute protects only acts and omissions occurring in "the exercise of the discretion vested in" the employee. (§ 820.2; *McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252, 261 [74 Cal.Rptr. 389, 449 P.2d 453]; *Wallace* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1385, 1403-1404 [16 Cal.Rptr.2d 113].)

In the landmark case construing this phrase, *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352], the Supreme Court

held that the mere existence of discretionary choice in the act to be performed does not bring the act within the reach of Government Code section 820.2, as virtually all acts a governmental employee is called upon to perform involve some degree of choice. (69 Cal.2d at pp. 788-790.) Rather, the high court held, immunity should attach only to those decisions which involve "basic policy" choices which constitute an exercise of discretion by a coordinate branch of government and therefore should " 'remain beyond the range of judicial inquiry.' " (*Id.* at p. 793, quoting 3 Davis, Administrative Law Treatise (1958) § 25.11, p. 484.)

The court thereafter noted, in *McCorkle* v. *City of Los Angeles, supra,* 70 Cal.2d 252, that claims of immunity by public employees had "frequently required judicial determination of the category into which the particular act falls: i.e., whether it was ministerial because it amounted 'only to obedience to orders, or the performance of a duty in which the officer is left no choice of his own,' or discretionary because it required 'personal deliberation, decision and judgment.' [Citation]." (70 Cal.2d at pp. 260-261.)

Actions which have been found to be within the discretion of a public employee, and therefore immune under section 820.2, have included the decision to initiate dependency proceedings in behalf of a minor (*Alicia T.* v. *County of Los Angeles, supra,* 222 Cal.App.3d at pp. 882-883).[9] Actions which have been found "ministerial" and thus not immune have included negligence, essentially of the same kind as is alleged here, in the supervision of a minor in foster care. (*Elton* v. *County of Orange* (1970) 3 Cal.App.3d 1053, 1057 [84 Cal.Rptr. 27].)[10] ■ Actions that are manifestly ministerial, because they amount only to obedience to orders which leave the officer no choice, plainly include actions governed by specific statutory or regulatory directives. Such actions have been found nondiscretionary, and thus not immunized, because they entail the fulfillment of enacted requirements. (*Ramos* v. *County of Madera* (1971) 4 Cal.3d 685, 694 [94 Cal.Rptr. 421,

---

[9]Other examples include (1) the decision to release a juvenile offender to the custody of his mother and the determination of the degree of supervision to exercise over the custodian (*Thompson* v. *County of Alameda, supra,* 27 Cal.3d at p. 749), and (2) the selection of an adoptive placement for a minor (*Ronald S.* v. *County of San Diego, supra,* 16 Cal.App.4th at pp. 896-897).

[10]Other cases have condemned the (1) failure to warn a potential foster parent of dangerous propensities of a minor placed in her care (*Johnson* v. *State of California, supra,* 69 Cal.2d at p. 797), (2) negligent procedures in the investigation of an automobile accident (*McCorkle* v. *City of Los Angeles, supra,* 70 Cal.2d at p. 261) and (3) failure of a police officer to warn a prosecution witness of potential danger from the defendant's associates (*Wallace* v. *City of Los Angeles, supra,* 12 Cal.App.4th at pp. 1403-1404; *Carpenter* v. *City of Los Angeles* (1991) 230 Cal.App.3d 923, 935 [281 Cal.Rptr. 500]).

484 P.2d 93]; *Wheeler* v. *County of San Bernardino* (1978) 76 Cal.App.3d 841, 849 [143 Cal.Rptr. 295]).[11]

 In this case, regulation 30-342 required a social worker to "monitor the . . . physical and emotional condition" of a child in foster care and "take necessary action to safeguard the child's growth and development while in placement." Specifically, the regulation required a social worker, in the monitoring and safeguarding of a child, to have monthly face-to-face contact with the child and the foster parent, except in specified circumstances. Under regulation 30-342 and its successor regulation 31-320, such regular periodic contacts are required unless the placement has been determined to be stable, the child is placed with a relative, or there exist other facts, inapplicable here, *and* written second level supervisory approval for less frequent visits has been obtained. (For the text of this regulation, see fn. 2, *ante.*) The regulation 30-342 requirements, including the requirement of monthly face-to-face contact, *plainly constituted mandatory requirements* which left Maxwell no choice on the issue of the frequency of visits to Jimmee.

Although Jimmee was placed with a relative, Maxwell had no reliable basis for her conclusion that the placement was stable. Further, there was no evidence that a supervising social worker had given written approval for a reduced schedule of visits. Thus, her failure to visit Jimmee on a monthly basis was not an omission resulting from an exercise of discretion vested in Maxwell under the regulation; consequently, it was *not* an immune activity under Government Code section 820.2.

We concluded in *Alicia T.* v. *County of Los Angeles, supra,* 222 Cal.App.3d 869, that a social worker's decision to institute dependency proceedings must be discretionary because of the urgent necessity of "the continuing exercise of . . . discretion in favor of the protection of minor children." (222 Cal.App.3d at p. 883.) The same consideration compels us to determine in this case that individual county social workers do *not* have discretion regarding compliance with regulations requiring monthly home visits to children in foster care. The standards set by DSS Manual regulation 30-342 establish *minimum* schedules for home visits. If those standards are deemed discretionary, the effect can only be to decrease, not increase, the protection afforded to children. Maxwell had no discretion to visit Jimmee less frequently than monthly.

---

[11]Examples of such actions are the determination of whether an applicant for Aid to Families with Dependent Children (AFDC) meets applicable eligibility standards (*Ramos* v. *County of Madera, supra,* 4 Cal.3d at p. 694) and the recording of a survey by a county surveyor (*Wheeler* v. *County of San Bernardino, supra,* 76 Cal.App.3d at p. 849).

### c. *Government Code Section 821.6.*

■ We also reject the contention that Maxwell's challenged acts and omissions were immune under Government Code section 821.6. Social workers indeed have immunity under that section for their conduct in the initiation and prosecution of proceedings under sections 300 through 396 of the Welfare and Institutions Code. (*Ronald S.* v. *County of San Diego, supra,* 16 Cal.App.4th 887, 899; *Alicia T.* v. *County of Los Angeles, supra,* 222 Cal.App.3d at p. 883; *Jenkins* v. *County of Orange* (1989) 212 Cal.App.3d 278, 283 [260 Cal.Rptr. 645].) However, the negligence with which the defendants are charged in this case did not occur in the performance of their prosecutorial, or quasi-prosecutorial functions.[12]

The responsibilities of public welfare agencies respecting children are set forth in two separate divisions of the Welfare and Institutions Code. Division 2 of the code, in particular chapter 2 of part 1 of that division (The Juvenile Court Law, § 200 et seq.), provides for court jurisdiction over minors who are abused or neglected by their parents or guardians (Welf. & Inst. Code, § 300 et seq.), habitually disobedient or truant minors (Welf. & Inst. § 601 et seq.), and minors who commit crimes (Welf. & Inst. Code, § 602 et seq.). Section 272 in that chapter authorizes a county board of supervisors to delegate to the county welfare department all or part of the duties of the probation officer concerning abused or neglected children who are made dependents of the juvenile court. Only those functions performed by child welfare workers under section 272 may reasonably be included among the prosecutorial and quasi-prosecutorial functions which are entitled to immunity under Government Code section 821.6.

The actual delivery of public social services, such as foster care, to abused, neglected or exploited children is governed by division 9 of the Welfare and Institutions Code, respecting public social services, in particular part 4 of that division, respecting services for the care of children. (§ 10001, subd. (c); § 16501.) The delivery of such services is a county function, which is subject to the regulations of the State Department of Social Services and of the State Department of Health Services respecting all services for which state and federal funds are provided. (Welf. & Inst. Code, § 10800.)[13]

The acts and omissions complained of in this case occurred in the delivery of "public social services" as defined in Welfare and Institutions Code

---

[12]We held in *Alicia T., supra,* that section 821.6 immunizes social workers from liability for their conduct in the performance of quasi-prosecutorial functions relating to proceedings under Welfare and Institutions Code section 300. (222 Cal.App.3d at p. 883.) We do not retreat from that holding. However, the same immunity does not extend to other functions of social workers.

[13]State grants-in-aid are provided to counties under Welfare and Institutions Code section 10001 for the purpose of supporting, maintaining and protecting abused and neglected

section 10051 and governed by division 9, sections 10000 through 18989.3, of that code. In particular, they occurred in the delivery of "child welfare services," as defined in Welfare and Institutions Code section 16501 and governed by part 4, sections 16000 through 16583, of division 9. These functions are separate and distinct from those quasi-prosecutorial functions which are entitled to Government Code section 821.6 immunity.

■ Where there is negligence, as there manifestly was in this case, liability for resulting harm is the rule, and immunity is the exception. (*Ramos* v. *County of Madera, supra* , 4 Cal.3d at p. 692; *Johnson* v. *State of California, supra,* 69 Cal.2d at p. 798; *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 219 [11 Cal.Rptr. 89, 359 P.2d 457].) Accordingly, particular immunities have been strictly construed to apply only to the functions which the statute or common law rule creating each immunity was intended to protect; immunities have not been applied to other activities, whether or not the person claiming immunity sometimes, or even ordinarily, fulfills the protected functions. (See, e.g., *Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 719-720 [117 Cal.Rptr. 241, 527 P.2d 865]; *James W.* v. *Superior Court* (1993) 17 Cal.App.4th 246, 255-257 [21 Cal.Rptr.2d 169].)

This limitation upon immunities is manifestly just. An immunity is, after all, a license to *harm.* Thus, it should not extend beyond those functions which are so necessary to the public good that the public benefit from the free exercise of discretion in such functions plainly outweighs the private harm that may flow from misfeasance.

■ *CSW's must be entitled to prosecutorial immunity for instituting and* processing proceedings under Welfare and Institutions Code section 300, because the urgent need for the protection provided by such proceedings outweighs the harm which may flow from an erroneous decision to initiate them. (*Alicia T.* v. *County of Los Angeles, supra,* 222 Cal.App.3d at p. 883.) The same balance of interests does not affect the separate and distinct functions of supervising the foster care of children who are the subject of dependency proceedings. Thus, there is no policy reason for extending prosecutorial immunity to these nonprosecutorial functions and there is no immunity.

2. *The Court Properly Took Judicial Notice of Regulations in the DSS Manual.*

■ The County next contends the court improperly took judicial notice of DSS regulation 30-342, portions of which were read to the jury in special instruction 7. We disagree.

children, as well as other persons in need of such assistance, "within the limits of public resources." (Welf. & Inst. Code, § 10001.)

Section 451 of the Evidence Code requires judicial notice to be taken of matters made a subject of judicial notice by Government Code section 11343.6. That statute requires judicial notice to be taken of the contents of regulations that are adopted by state agencies and filed with the Secretary of State.

Welfare and Institutions Code section 16501 requires the DSS to establish regulations for the supervision of the care received by children in foster care. The regulations formerly found in division 30 of the DSS Manual, including regulation 30-342, were regulations established by the DSS pursuant to section 16501. Those regulations, as are their successor regulations in division 31, were duly adopted pursuant to the Administrative Procedures Act (Gov. Code, § 11340 et seq.) and filed with the Secretary of State. (See Cal. Code Regs., tit. 22, div. 2, pt. 1, "Department of Social Services— Manuals of Policies and Procedures.") The regulations thus have the force of law and are matters subject to mandatory judicial notice. (Evid. Code, § 451; Gov. Code, § 11343.6; *People* v. *Haugh* (1963) 216 Cal.App.2d 603, 606 [31 Cal.Rptr. 74] [construing Gov. Code, former § 11383, which provided the same as § 11343.6 in relevant part].)

Jimmee's expert, Albert A. Colon, a former chief of family and children's services for the state DSS, testified in a hearing under Evidence Code section 402 that the version of regulation 30-342 which Jimmee submitted to be read to the jury was duly adopted and filed in 1985 and was in effect in 1987 and 1988. Colon's testimony provided a sufficient basis for judicial notice of the regulation. (*People* v. *Haugh, supra,* 216 Cal.App.2d at p. 606.)

3. *The Court Did Not Improperly Exclude Evidence of Reasonable Efforts by the County to Discharge Its Mandatory Duties.*

██ The County next contends it was erroneously precluded from presenting evidence of its extreme budgetary limitations, which it contends prevented its employees from fully and literally complying with regulatory requirements. Under Government Code section 815.6, a government agency is liable for failure to fulfill mandatory duties if resulting injuries are of a kind which the enactment imposing the duty was designed to prevent. However, there is no such liability if the public entity establishes it exercised reasonable diligence to discharge the duty. (See fn. 4, *ante.*) The County contends it could have established that it exercised "reasonable diligence" to fulfill its duties to Jimmee if the court had allowed it to show its diligence in supervising Jimmee's placement was reasonable, *given existing budgetary constraints.*

The County's contention lacks merit for two reasons. First, the record does not support the County's claim that it was precluded from presenting

evidence of its financial constraints.[14] The defendants have not demonstrated that any specific evidence of financial constraints, or their effect on DCS, was ever excluded.

Secondly, and more importantly, even assuming *arguendo* that specific evidence of financial constraints had been offered and excluded, such exclusion would have been proper, as the evidence would have been irrelevant. Financial limitations of governments have never been, and cannot be, deemed an excuse for a public employee's failure to comply with mandatory duties imposed by law. (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 217 [211 Cal.Rptr. 398, 695 P.2d 695]; *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 680 [94 Cal.Rptr. 279, 483 P.2d 1231]; *Wallace* v. *City of Los Angeles*, *supra*, 12 Cal.App.4th at p. 1402.)

■ It is indeed true that Welfare and Institutions Code section 10001, subdivision (a), makes the provision of public social services subject to "the limits of public resources." However, sound public policy precludes delegating to individual public employees the determination of the manner in which limited resources are to be utilized, particularly where specific statutes or regulations state specific requirements. (*Ramos* v. *County of Madera*, *supra*, 4 Cal.3d 685, 693.)

■ Policies for the supervision of children in foster care are established *at the state level* by the state DSS. (Welf. & Inst. Code, § 16501.) The DSS Manual, including regulation 30-342, establishes requirements for the frequency of home visits to such children. Local governments and their employees have the merely ministerial duty of carrying out these requirements. If the requirements cannot be fulfilled with funding available to a local agency, the agency must address its concerns to those with the authority to set policy, not to the courts by way of excusing violations of mandatory requirements.[15]

---

[14]At the hearing on Jimmee's motion *in limine* to exclude evidence of budgetary constraints, the court ruled that: (1) Maxwell and other individual county employees would be allowed to testify as to what each was able to accomplish in the time and with the resources available to him or her during the time when Jimmee was placed with Bullock; and (2) however, before any party would be allowed to adduce testimony that, as a general matter, failures by DCS to fulfill its mandatory duties were owing to financial constraints, such party would be required to approach the bench and make an offer of proof as to the relevancy of such testimony.

[15]Moreover, any impartial review of the record demonstrates beyond doubt that this case is about the negligence of the County and its employees, not a shortfall in County resources. In this regard, we cannot help observing that Maxwell's belief that Jimmee's placement was "stable," and therefore visits were not needed, should have been exploded by the receipt of a

### 4. *Apportionment of Fault.*

 Defendants next contend that, if they are not immune from liability for Jimmee's injuries, they are at least not liable to the extent stated in the jury's verdict, which sets the County's liability at 75 percent, Maxwell's at 24 percent, and that of the apparently judgment-proof Bullock at only 1 percent. The defendants contend the jury's apportionment of fault was the result of passion and prejudice and was not supported by the evidence. The defendants also contend the jurors were confused by the special verdict form as to the manner in which fault should be apportioned among the County, Maxwell and Bullock, and therefore were unable to make a proper apportionment. We believe both contentions have merit.

### a. *Sufficiency of the Evidence.*

 We review a jury's apportionment of fault under the substantial evidence standard and will disturb the finding only if unsupported by the evidence. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Von Beltz* v. *Stuntman, Inc.* (1989) 207 Cal.App.3d 1467, 1484 [255 Cal.Rptr. 755]; *Bradfield* v. *Trans World Airlines, Inc.* (1979) 88 Cal.App.3d 681, 687 [152 Cal.Rptr. 172].) While the evidence was plainly sufficient to support the jury's finding that the defendants' negligence was a substantial contributing cause of Jimmee's injury, we fully agree with the defendants' contention that an allocation of only 1 percent of the fault to Bullock was improper as a matter of law.

Division One of this court has recently reached a similar result in *Pamela B.* v. *Hayden*█ (Cal.App.). In that case, the plaintiff was assaulted and raped in the garage of her apartment building. A jury found the landlord's failure to provide adequate security in the garage was a legal cause of the plaintiff's injury, awarded the plaintiff $1.2 million in damages, and attributed 95 percent of the fault for her injury to the landlord, while attributing only 4 percent to the rapist and 1 percent to his aider and abettor. Announcing the result in that case, Justice Vogel pronounced the apportionment of fault "blatantly unfair, inequitable and unsupported. . . ." (25 Cal.App.4th at p. 805.) The result here is similarly unsupported and unsupportable.

---

child abuse hotline call, reporting that a child in Bullock's care had two black eyes. Regulation 30-132 would seem to have required a personal response to such a call within three days, or ten at the longest. Maxwell testified that she believed the report was made by Latitia and was fabricated. However, the presence or absence of black eyes could readily have been verified and certainly should have been. It is both preposterous and unacceptable to suggest that Maxwell's failure to check on the abuse allegation through a personal visit was caused by the County's budget problems.

We would agree that the defendants here are more culpable than the landlord in *Pamela B.* and it would not be unreasonable to find their share of responsibility for Jimmee's damages greater than that which might ultimately be imposed on Pamela B.'s landlord. That landlord, after all, was guilty at worst of a passive omission (25 Cal.App.4th at pp. 801-803), while the defendants here, acting with the authority and power of the state, delivered Jimmee into Bullock's hands, kept her there by force of law, and yet ignored other laws *which were intended for Jimmee's protection* and which *required* them to act.

In addition, the landlord in *Pamela B.* had only the general duty imposed upon a possessor of land to exercise ordinary care in the management of his property. (Civ. Code, § 1714, subd. (a); *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 118-119 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) By contrast, Maxwell's *primary duty*, when acting within the scope of her employment, was the protection of children in foster care.[16] She thus had a duty to the plaintiff that was greater than the general duty of ordinary care. (Cf. *Rosh* v. *Cave Imaging Systems, Inc., supra*, 26 Cal.App.4th at p. 1238.)

The relatively active role of the defendants in causing Jimmee's harm, *together with their heightened duty to prevent it*, is a circumstance which suggests these defendants may reasonably be found more culpable than an ordinary citizen who fails to protect another from criminal acts, and hence may reasonably be assigned a greater proportion of the blame for Jimmee's harm. Still, the evidence cannot be stretched to support an apportionment of 99 percent of the fault to the negligent defendants and only 1 percent to the person who filled a tub with scalding water, lifted Jimmee into it and held her there until her flesh was burned to the bone. No reasonable jury could conclude Bullock's fault was as trifling as the jury's allocation would suggest.

b. *Instructional Error.*

 It was reasonably likely that the language in the special verdict form misled the jury as to the proper manner of apportioning fault. The special verdict form posed four questions: (1) whether any of the defendants

---

[16]In this respect, the circumstances of this case resemble those in another recent case, *Rosh* v. *Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225 [32 Cal.Rptr.2d 136]. In *Rosh*, the Court of Appeal declined to disturb a jury's apportionment of 25 percent of the liability for the plaintiff's injury to an assailant who deliberately shot him and 75 percent to his employer's private security company, which failed to protect him. The court's holding was based in part upon the circumstance that the security company was in the business of providing protection from criminal activity at the plaintiff's workplace. (26 Cal.App.4th at p. 1238.)

in the action was negligent; (2) if any defendant was negligent, whether such negligence was a legal cause of Jimmee's injuries; (3) the amount of Jimmee's economic, noneconomic and total damages; (4) the percent of negligence of each defendant *and* of Bullock.[17]

Apparently confused by the last question, the jury asked the court for clarification about "the addition of Dorothy Bullock as 'other person' in Question 4 item (d) . . . in general and as it pertains to negligence as a legal cause." When the jury's query was read, the defendants asked that Bullock's name be added to questions 1 and 2. However, the court declined to do so.

We cannot fault the court for so ruling, as such addition would have done little to clarify how fault was to be apportioned in question 4. It is the language of question 4 itself that was misleading as to the proper manner of assessing proportional liability in a case where one or more defendants are negligent and another defendant, or an unnamed third party, *intentionally* caused the plaintiff's injuries.

Section 1431.2 of the Civil Code provides that in an action for personal injury based upon principles of comparative fault, the liability of each defendant for noneconomic damages shall be several, not joint, and each defendant shall be liable "only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's *percentage of fault*. . . ." (Italics added.) Shortly after modifying the common law principle of equitable indemnity in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] to include principles of comparative fault (20 Cal.3d at p. 598), the Supreme Court held that such principles apply between a negligent defendant and one whose liability derives from principles of strict liability. (*Safeway Stores, Inc.* v. *Nest-Kart* (1978) 21 Cal.3d 322, 328 [146 Cal.Rptr. 550, 579 P.2d 441].) The *Nest-Kart* court concluded that ". . . juries are fully competent to apply comparative fault principles between negligent and strictly liable defendants." (*Id.* at p. 331.)

A recent appellate court decision, *Weidenfeller* v. *Star & Garter*, *supra*, 1 Cal.App.4th 1, applied the reasoning of *Nest-Kart*, *supra*, to a case in which the jury had apportioned liability between a negligent defendant and a third

---

[17]Question 4 on the special verdict form posed the following query: "Assuming that 100% represents the total negligence which was the legal cause of the plaintiff's damages, what percentage of this 100% is due to the negligence of the following:

| Answer: | To Defendant | County of Los Angeles | ____ |
| | Defendant | Zsa Zsa Maxwell | ____ |
| | Defendant | Clara Johnson, Ph.D. | ____ |
| | Other person | Dorothy Bullock | ____ " |

party who *intentionally* assaulted the plaintiff. The *Weidenfeller* court held that an action in which one tortfeasor acted negligently and another acted intentionally is "an action based upon principles of comparative fault," and therefore Civil Code section 1431.2 applies to such an action. (1 Cal.App.4th at pp. 6-7.)[18]

The total liability in *Weidenfeller* was divided between the negligent and intentional actors, even though only the former was named as a defendant. Such a division of liability between sued and unsued persons has since been ratified by the Supreme Court. In *DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593 [7 Cal.Rptr.2d 238, 828 P.2d 140], the high court construed section 1431.2 to mean a defendant is liable only for a proportionate share of noneconomic damages as compared with *all fault*, and not merely as compared with the fault of the defendants present in the lawsuit. (2 Cal.4th at pp. 603-604.)

Here, the jury was correctly instructed to apportion liability for Jimmee's injuries among Maxwell, the County and Bullock, even though Bullock did not appear. (*DaFonte* v. *Up-Right, Inc., supra*, 2 Cal.4th at pp. 603-604; *Weidenfeller* v. *Star & Garter, supra*, 1 Cal.App.4th at pp. 4-5.) However, the special verdict form asked the jury only to determine the percentage of *negligence* by each named person, which was a legal cause of Jimmee's injuries. Inasmuch as Bullock's act in burning Jimmee was entirely and obviously intentional, and only her subsequent failure to seek immediate medical treatment could conceivably be considered merely negligent, the jurors might reasonably have found only 1 percent of the *negligence* which caused the tragic chain of events was Bullock's, even if they believed her share of the *fault*, within the meaning of Civil Code section 1431.2, was greater.

The special verdict in this case substantially followed the language of the standard special verdict in BAJI No. 16.00, designed for use in actions for negligence.[19] However, under principles established in *DaFonte* v. *Upright, Inc., supra*, 2 Cal.4th 593, *Safeway Stores, Inc.* v. *Nest-Kart, supra*, 21 Cal.3d

[18]*Weidenfeller* was followed by an opinion of the Ninth Circuit in *Martin* v. *United States* (9th Cir. 1993) 984 F.2d 1033. While on an outing with other children in a government operated day-care center, Jennifer Martin was abducted, owing to serious negligence by the center's director, and was raped. She sued and recovered economic and noneconomic damages, which the district court refused to apportion between the government and the kidnapper, who apparently never was caught. (984 F.2d 1034-1035.) The United States appealed, arguing Civil Code section 1431.2 limited its share of the noneconomic damages. (984 F.2d at pp. 1034-1035.) The court agreed, citing *Weidenfeller*, and reversed for an apportionment of damages. (*Id.* at pp. 1038-1040.)

[19]BAJI No. 16.00 reads in pertinent part as follows:

"Question No. 6: Assuming that 100% of the total negligence which was the cause of the plaintiff's [injury] [damage], what percentage of this 100% is due to the contributory

322 and *Weidenfeller* v. *Star & Garter, supra,* 1 Cal.App.4th 1, a more appropriate form of special verdict would be one which follows the language of the standard special verdict in BAJI No. 16.12.[20]

The use note following BAJI No. 16.12 indicates it is designed only for use in cases involving defective products liability with comparative fault and claims of comparative implied indemnity. Such use follows the rule of *Safeway Stores, Inc.* v. *Nest-Kart, supra,* 21 Cal.3d 322. However, we are in accord with the court in *Weidenfeller* v. *Star & Garter, supra,* 1 Cal.App.4th 1, and believe that precisely the same principles apply in cases involving liability based upon commission of an intentional tort with comparative fault and claims of comparative implied indemnity. ▮ It follows that in *all* cases in which a negligent actor and one or more others jointly caused the plaintiff's injury, the jury should be instructed that, assuming 100 percent represents *the total causes* of the plaintiff's injury, liability must be apportioned to each actor who caused the harm in direct proportion to *such actor's respective fault,* whether each acted intentionally or negligently or was strictly liable (*Safeway Stores, Inc* v. *Nest-Kart, supra,* 21 Cal.3d at p. 328; *Weidenfeller* v. *Star & Garter, supra,* 1 Cal.App.4th at pp. 7-8), and whether or not each actor is a defendant in the lawsuit (*DaFonte* v. *Up-Right, Inc., supra,* 2 Cal.4th at p. 602). Obviously, only theories of liability actually supported by the evidence should be mentioned in the instruction.

### c. *Prejudice of the Misleading Verdict Form.*

▮ In our view, the confusing language used in the verdict form, which obviously is in the nature of a jury instruction, was prejudicial to the

---

negligence of the plaintiff and what percentage of this 100% is due to the negligence of the defendant[s] [and all other persons]?
"Answer: To plaintiff _____ _____ %
 "[To plaintiff _____ _____ %]
 "To defendant _____ _____ %
 "[To defendant _____ _____ %]
 "[Other person _____ _____ %]
 (identify)

 "TOTAL _____ % . . ."

Language in the standard special verdict form which refers to the contributory negligence of the plaintiff was obviously unsupported by the evidence in this case and was deleted.

[20]BAJI No. 16.12 provides: "Assuming that 100% represents *the total causes* of the plaintiff's [injury] [damage], what percentage of this 100% is attributable to the comparative *fault* of the plaintiff and what percentage of this 100% is attributable to the defendant[s] [and all other persons]?" (Italics added.)

County. ▪ " 'Article VI, section 13 of the California Constitution provides that error in instructing the jury shall be grounds for reversal only when the reviewing court, "after an examination of the entire cause, including the evidence," concludes that the error "has resulted in a miscarriage of justice." The test of reversible error has been stated in terms of the likelihood that the improper instruction misled the jury. [Citation.]' [Citations.] Thus, if a review of the entire record demonstrates that the improper instruction was so likely to have misled the jury as to become a factor in the verdict, it is prejudicial and a ground for reversal. [Citation.] 'To put it another way, "[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction prejudice appears and this court 'should not speculate upon the basis of the verdict' " [Citations.]' [¶] 'The determination whether, in a specific instance, the probable effect of the instruction has been to mislead the jury and whether the error has been prejudicial so as to require reversal *depends on all of the circumstances of the case*, including the evidence and the other instructions given. No precise formula can be drawn.' [Citations.]" (*Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 335 [5 Cal.Rptr.2d 594].)

▪ Among the factors which are considered in assessing the prejudice of an erroneous or misleading jury instruction are (1) the degree of conflict in the evidence on critical issues, (2) whether the jury requested a rereading or clarification of the erroneous instruction, (3) the effect of other instructions in remedying the error and (4) the closeness of the jury's verdict. (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946]; *Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 123-124 [273 Cal.Rptr. 457].)

▪ Here, as we have observed, evidence respecting the apportionment of fault was not merely in conflict. It strongly supported a much larger apportionment to Bullock than appeared in the verdict.

As we have also observed, the jury requested clarification of question 4, respecting the addition of Bullock "in general," and also ". . . as it pertains to negligence as a legal cause." The import of the second part of the query is not clear. However, it is reasonably likely the question arose because the evidence showed that Bullock acted intentionally and only the defendants acted negligently, but the special verdict only asked the jury to determine the proportion of *negligence* that was attributable to each actor.

The jurors' confusion was not remedied either by the court's supplemental instruction in response to their query or by other instructions. In response to

the jury's query, the court restated the instruction, using the word "fault," rather than "negligence," in explaining what was to be apportioned among the named persons.[21] However, the court did not explain that fault is a broader concept than negligence, and the jury might reasonably have understood the court to be using the terms as if they were equivalent.

The court also directed the jury to review the other instructions previously given which related to their concerns. However, the other instructions relating to the issue of fault *all* referred to negligence, and *only* negligence, as a legal cause of damage. Thus, reference to those instructions could only have further misled the jury.

Finally, the jury's verdict was close on the issue affected by the erroneous instruction. On the question of whether each defendant was negligent, the jury voted 11 to 1 that the County and Maxwell were negligent. However, on the issues of causation and apportionment of liability, the vote was only nine to three in favor of the verdict as returned.

In sum, the evidence established that Bullock acted intentionally, and the defendants acted negligently. Under this state of the evidence, the special verdict, which only asked the jury to determine the proportion of *negligence* attributable to each actor, allowed a greater apportionment of fault to the defendants than might reasonably have been found by a properly instructed jury. The judgment thus must be reversed and remanded for a new trial on the apportionment of damages.

---

[21]When the jury submitted a question about the special verdict form the trial judge summoned the jurors and the following exchange took place:

"THE COURT: You sent a note to the Court through the court liaison and I will read it for the record here. [¶] It says, 'Could you please address the addition of Dorothy Bullock as "other person" in Question 4, item D . . . , in general, and as it pertains to negligence as a legal cause?' [¶] Now, I am reluctant to get into any kind of rambling discourse of the law. As you can see, the instructions that you have received are rather specific and they are specific because we want to have as correct a statement of the law as possible. [¶] Let me answer your question this way and then ask you if that doesn't answer your question. After you go back into the jury room you can be a little bit more specific in your question. [¶] Then we can focus a little more specifically on the answer. [¶] Question No. 4, the special verdict form, requires the jury to apportion fault among the parties and any other person whose fault has been contributed as a legal cause to the plaintiff's injuries. [¶] You are assessing or apportioning that fault between the parties who are listed there and you assess a percentage of fault to each person or entity listed anywhere from 0 percent, if you don't feel they are at fault at all, to 100 percent if you feel they are totally at fault. But the answer has to end up as 100 percent. [¶] I would also encourage you to reread those instructions or parts—you have them in the jury room—that deal with your concerns. [¶] You may have somebody just read them out loud so everybody can hear what it is rather than just one person reading them."

## 5. *Application of the Collateral Source Rule.*

The defendants also contend they should have been allowed to present evidence that Jimmee's medical expenses have been paid by entities that are not wholly independent of the County and that other such expenses have been, and will continue to be, paid by a private charity. The entities which the County contends have either paid Jimmee's medical expenses or provided medical care free of charge are county foster care insurance, AFDC, Medi-Cal, and the Shriner's Hospital.

Evidence of any payments that were made from insurance purchased by the County to cover its foster care program should have been admitted. Under the collateral source rule, one who suffers injury through the wrongful act of another is not precluded from proceeding against the wrong-doer for compensation, nor is the amount of compensation reduced, by receipt by the victim of payments from a source independent of the wrong-doer (*Anheuser-Busch, Inc.* v. *Starley* (1946) 28 Cal.2d 347, 349 [170 P.2d 448, 166 A.L.R. 198]), and the defendant in such an action cannot introduce evidence of any such payments (*Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6-13 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398]). However, the rule does not apply if the victim has been reimbursed before trial by a cash payment from the defendant personally or from the *defendant's* insurance carrier. (*Blake* v. *E. Thompson Petroleum Repair Co.* (1985) 170 Cal.App.3d 823, 832 [216 Cal.Rptr. 568]; *Turner* v. *Mannon* (1965) 236 Cal.App.2d 134, 140 [45 Cal.Rptr. 831]; *Dodds* v. *Bucknum* (1963) 214 Cal.App.2d 206, 212-213 [29 Cal.Rptr. 393].) The County was thus entitled to offset any recovery by Jimmee with payments made to her by insurance carried by the County and was entitled to introduce evidence of such payments.

The trial court properly excluded from evidence payments by AFDC and Medi-Cal and medical services provided by the Shriner's Hospital. Under Government Code section 985, in a lawsuit against a public entity for personal injury, the entity may not introduce evidence of payments to the plaintiff from Medi-Cal, AFDC, private medical programs and similar sources. (Gov. Code, § 985, subds. (a), (b), (f).) However, after the return of a verdict which includes damages for which such payments have been made or are obligated to be made, the entity may bring a noticed motion to have the judgment reduced by the amounts paid before trial. (Gov. Code, § 985, subd. (b).) Such motion must be noticed within the time allowed by section 659 of the Code of Civil Procedure. (*Ibid.*)

Upon the filing of a timely and proper motion by a public entity, a trial court must, on such terms as may be just, order reimbursement from the

judgment to the provider of any payments made by Medi-Cal, AFDC and other nonfederal publicly funded sources of benefits with statutory lien rights. (Gov. Code, § 985, subd. (f)(1).) If the plaintiff has received payments from private medical programs or similar sources, the court *may*, after considering the totality of the circumstances, and upon such terms as may be just, determine what portion of those payments shall be reimbursed to the provider, used to reduce the verdict, or accrue to the benefit of the plaintiff. (Gov. Code, § 985, subd. (f)(2).)

Upon retrial of this matter, the County shall be entitled to introduce evidence of payments made to Jimmee by insurance maintained by the County. The County may also make a posttrial motion for reduction of the judgment as provided in Government Code section 985.

### 6. *The Rate of Interest to Be Applied to the Entire Judgment Is 7 Percent.*

■ Finally, the defendants would appear to be correct in contending that the rate of interest applicable to all defendants' share of the judgment is 7 percent. As the plaintiff has expressly conceded, Government Code section 970.1, subdivision (b), limits the rate of interest on the County's share of the judgment to 7 percent. (*San Francisco Unified School Dist.* v. *San Francisco Classroom Teachers Assn.* (1990) 222 Cal.App.3d 146, 151-152 [272 Cal.Rptr. 38].) The intent of the Legislature in enacting section 970.1, subdivision (b), was to provide that execution and other remedies under the Code of Civil Procedure for enforcement of money judgments do not apply to enforcement of money judgments against local public entities. (222 Cal.App.3d at p. 151.) It would be inconsistent with that intent to allow interest at more than 7 percent on judgments against parties entitled to be indemnified by a local public entity. Under Government Code section 825, Maxwell is entitled to be indemnified by the County for her share of the judgment. To prevent the County from being liable for interest on a judgment in excess of that allowed by section 970.1, subdivision (b), interest on Maxwell's share of the judgment should also be limited to 7 percent.

### DISPOSITION

The judgment is reversed with respect to (1) the apportionment of damages among the County, Maxwell and Bullock and (2) the amount of damages to the extent that they would be impacted by evidence of payments made from insurance maintained by the County. The case is remanded for a redetermination of those issues. The judgment is otherwise affirmed. Upon

remand, the court will conduct further proceedings in accordance with the views expressed herein. The parties shall bear their own costs on appeal.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied August 25, 1994, and appellants' petition for review by the Supreme Court was denied October 20, 1994.