Filed 4/26/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| SAMANTHA B. et al.,<br><br>   Plaintiffs and Appellants,<br><br>v.<br><br>AURORA VISTA DEL MAR, LLC et al.,<br><br>   Defendants and Appellants. | 2d Civ. No. B302321<br>(Super. Ct. No. 56-2015-00464635-CU-PO-VTA)<br>(Ventura County)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 5, 2022, be modified as follows:

1.  On page 18, the word "First," which begins the first full paragraph, is deleted, so the sentence begins, "The regulation is expressly subject to …."

2.  On page 18, the second full paragraph, which begins, "Second, Valencia's conviction was not sealed …." is deleted.

3.  On page 22, the words in the last sentence of the first full paragraph "70 percent" are changed to "65 percent," so the sentence reads:  "The jury correctly attributed 65 percent of the fault to Aurora and Signature."

Defendants and Appellants' petition for rehearing is denied.
There is no change in the judgment.

Filed 4/5/22; on rehearing (unmodified opn.)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| SAMANTHA B. et al., | 2d Civ. No. B302321 |
| Plaintiffs and Appellants, | (Super. Ct. No. 56-2015-00464635-CU-PO-VTA) |
| v. | (Ventura County) |
| AURORA VISTA DEL MAR, LLC et al., | OPINION FOLLOWING REHEARING |
| Defendants and Appellants. | |

   Civil Code section 3333.2, known as the Medical Injury Compensation Reform Act of 1975 (MICRA), limits noneconomic damages to $250,000 based on professional negligence.  Here we decide this limitation does not apply to plaintiffs' causes of action under the Elder Abuse and Dependent Adult Civil Protection Act (Elder Abuse Act).  (Welf. & Inst., § 15600 et seq.)[1]

---

  [1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

Samantha B. and Danielle W. (Plaintiffs) are former patients at an acute psychiatric hospital.[2] While residing at the hospital, they suffered sexual abuse by a hospital employee. They brought this action against the hospital and its management company, alleging professional negligence and breach of the Elder Abuse Act. The jury found for Plaintiffs and awarded substantial noneconomic damages against both defendants, as well as punitive damages against the management company. Defendants appeal. Plaintiffs appeal the trial court's grant of a motion for nonsuit on their causes of action alleging vicarious liability under respondeat superior and ratification. These causes of action are properly brought before a court or jury.

The matter is reversed and remanded for a new trial on the issue of respondeat superior and ratification. In all other respects, the judgment is affirmed.

## FACTS

Aurora Vista Del Mar, LLC (Aurora) is a licensed acute psychiatric hospital. Aurora is wholly owned by Signature Healthcare Services, LLC (Signature). Both entities are wholly owned by Doctor Soon Kim, who owns 11 similar hospitals nationwide.

Signature has a management agreement with Aurora. Among other tasks, Signature agreed to provide "[d]aily operational direction and management" and "[c]linical responsibility for all service programs."

---

[2] Plaintiff C.F. is no longer a party to this action. This court dismissed her appeal pursuant to the stipulation of the parties on October 18, 2021.

*Aurora Hires Valencia*

In July 2011, Aurora hired Juan Valencia as a mental health worker. The duties of a mental health worker include seeing that patients do not harm themselves or others, keeping patients in a safe environment, and helping patients with daily living activities. Mental health workers are not licensed.

When Valencia was hired, he was given a form in which he was asked whether he had been arrested for a crime requiring registration as a sex offender. He answered no.

In fact, Valencia had been arrested in 1989 for sexual penetration with a foreign object (Pen. Code, § 289, subd. (b)) and unlawful sexual intercourse with a minor (*id.*, § 261.5, subd. (c)). Sexual penetration with a foreign object requires registration, but intercourse with a minor does not. (*Id.*, § 290, subd. (c).) He pled guilty to sexual intercourse with a minor and the other charge was dismissed. The court reduced Valencia's conviction to a misdemeanor and dismissed it in 2008.

Aurora retained an investigative consumer reporting agency to conduct a background check on Valencia. Such agencies are prohibited from reporting an arrest or conviction that antedates the report by more than seven years. (Civ. Code, § 1786.18, subd. (a)(7).) The agency did not report Valencia's 11-year-old arrest or conviction.

Had Aurora hired certified nursing assistants (CNA's), instead of unlicensed mental health workers, it would have had notice of any such prior conviction. CNA's are fingerprinted and licensed.

*Training*

To be a mental health worker, no license, experience, education, or training is required. As one former Aurora

employee put it, "one day they work at McDonalds, the next day they are mental health workers." Aurora gave Valencia two days of orientation.

The orientation included three to five minutes on countertransference, that is, the tendency of a caregiver to form an emotional bond with a patient. Thereafter, all Valencia needed to do was sign a form on patient and staff interactions and relationships once a year. Staff were not tested to see if they understood patient boundaries.

Plaintiffs' expert testified, "If you read the depositions of multiple staff at the facility, nursing staff, nursing assistants or they call them 'psyche techs' at that facility, it was very clear that they had no idea what transference or countertransference even meant."

*Policy on Access to Patients*

It is Aurora's policy to allow male mental health workers to be alone with female patients in their rooms for up to 20 minutes as long as the door to the room is open.

Jamie Tallman, an Aurora psychiatric nurse, testified that the charge nurse for the unit spends most of the time at the nursing station. The nurse cannot see into the patients' rooms from the nursing station. One must go into the room to see what is happening there. Walking up and down the hallway is not enough. The charge nurse relies on the mental health workers for information on the patients.

*Valencia Sexually Violates Plaintiffs*

Plaintiffs were patients at Aurora in 2013 during the time Valencia worked there. Each was suffering from psychosis and did not have the mental capacity to consent to sex. Valencia

4.

engaged in sexual relations with all three individually while they were at Aurora.

Valencia became known among hospital workers as "Rapey Juan."  A worker reported the nickname to the supervising nurse. The nurse's response was to roll her eyes and say something like "What are you going to do?"

### Bravo Incident

In 2004, an Aurora male employee named Bravo sexually molested a 17-year-old female patient.  Theresa Berkin, who was at that time Aurora's director of clinical services, recommended to Aurora's CEO that the hospital increase education to improve therapeutic boundaries.  The CEO said that corporate, meaning Signature, would not pay for it.  Berkin testified there were other incidents while she was at Aurora in which a staff member interreacted sexually with a patient.

### Patient Vulnerability

Patients in an acute psychiatric hospital are vulnerable. Their mental disorders may impair their judgment.  Some suffer from cognitive impairments similar to dementia.  Some patients receive medications that render them temporarily unconscious. Plaintiffs' expert testified that sexual assaults of mental patients are a known foreseeable risk.

### Understaffing

Mark Martinez was a mental health worker at Aurora from 2011 to 2014.  He testified that each patient was rated for "acuity" between one and four, with four being the most acute. The entire unit was rated for acuity based on an aggregation of scores of the individual patients.  A formula would be applied to the unit's acuity rating to determine the appropriate staffing level.  Martinez testified the unit was consistently understaffed.

He said he was on his own with 16 to 24 patients. He complained to the nursing supervisor, the staffing coordinator, and to anyone who would listen, to no avail.

Psychiatric nurse Tallman worked at Aurora from 2010 to 2014. She testified the hospital was frequently understaffed. She complained to the director and assistant director of nursing.

Judy Pittacora, a licensed psychiatric technician, worked at Aurora from 2003 to 2014. She testified the units were more often than not understaffed. She said her supervisors would cross out the acuity number she assigned to a patient and lower it to lower the number of staff needed. Understaffing had an impact on her ability to supervise mental health workers. The workers were often on their own with patients. She complained about understaffing to her supervisors but was told that is how the hospital CEO wanted it. She quit because of understaffing. She was afraid she was going to lose her license.

*Failure to Report*

Danielle W. was discharged from Aurora on November 29, 2013. The next day a student nurse saw Valencia and the plaintiff together at a party. They appeared to be romantically involved. Aurora suspended Valencia and, after a two-day investigation, terminated him on December 12, 2013.

Aurora's CEO testified that Valencia was terminated only for being with a former patient at a party. The CEO did not suspect there had been any wrongdoing while the patient was hospitalized, even though the patient had been discharged only the day before the party. She did not interview Valencia, the hospital staff, or the former patient to see if any wrongdoing occurred while the former patient was hospitalized. She did not know whether anyone did.

6.

The CEO admitted that about a month after Valencia's termination she learned Valencia's conduct with the former patient at the party was sexual in nature. She also admitted that Aurora had a duty to report such an incident to the California Department of Public Health but did not do so for one year. Aurora only reported Valencia's misconduct after it became public knowledge.

*Procedure*

Samantha B. was discharged from Aurora on March 6, 2013. She filed the instant action against Aurora and Valencia in February 2015, within two years of her discharge. In June 2015, she added Signature to her complaint. She alleged sexual assault; intentional infliction of emotional distress; and violation of Civil Code section 51.9, sexual harassment in a professional relationship. She also alleged negligence in hiring, supervising, and retaining Valencia and dependent adult abuse under the Elder Abuse Act against Aurora. (§ 15600 et seq.) Danielle W. was discharged from Aurora on November 29, 2013. She filed a similar action within two years, in August 2015.

*Verdict and Judgment*

The jury found that Aurora and Signature were negligent in hiring, supervising, and retaining Valencia. The jury also found that Signature and Valencia committed acts constituting dependent adult abuse and that they acted with recklessness. The jury found that Signature acted with malice or oppression, but that Aurora did not.

The jury awarded Samantha B. $3.75 million; and Danielle W. $3 million, all in noneconomic damages. The jury allocated 30 percent fault to Signature, 35 percent fault to

7.

Aurora, and 35 percent fault to Valencia.  The jury awarded each plaintiff $50,000 in punitive damages.

DISCUSSION

Aurora and Signature's Appeal

I

*MICRA's Limitation of Actions*

Aurora and Signature contend Plaintiffs' causes of action are time-barred and their damages limited under MICRA.

MICRA is a legislative scheme that is intended to reduce the cost of medical malpractice insurance by, among other matters, limiting the time for plaintiffs to bring their causes of action for professional negligence and limiting the amount of recovery for noneconomic damages.  (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 111.)

Code of Civil Procedure section 340.5, a part of MICRA, provides in part:  "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first."

A "health care provider" is any person licensed to provide health care services including a health facility.  (Code Civ. Proc., § 340.5, subd. (1).)  "Professional negligence" means "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital."  (*Id.*, subd. (2).)

A plaintiff's noneconomic damages are limited under MICRA to $250,000. (Civ. Code, § 3333.2, subd. (b).)

Plaintiffs appear not to contest that if MICRA applies, their action is barred by the time limitations in Code of Civil Procedure section 340.5. They contend, however, that MICRA does not apply. Instead, they claim the Elder Abuse Act applies. Unlike MICRA, the Elder Abuse Act has a two-year statute of limitations (Code Civ. Proc., § 335.1) subject to tolling for "insanity" under Code of Civil Procedure section 352. (*Benun v. Superior Court* (2004) 123 Cal.App.4th 113, 125-126.)

*Elder Abuse Act*

Unlike MICRA, which is designed to discourage medical malpractice suits, the Elder Abuse Act enables "interested persons to engage attorneys to take up the cause of abused elderly persons and dependent adults." (§ 15600, subd. (j).)

Section 15657, subdivision (a) provides, in part: "Where it is proven by clear and convincing evidence that a defendant is liable for . . . neglect as defined in Section 15610.57, or abandonment as defined in Section 15610.05, and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse, the following shall apply, in addition to all other remedies otherwise provided by law: [¶] (a) The court shall award to the plaintiff reasonable attorney's fees and costs. . . ."

The Legislature has made it clear that professional negligence and the Elder Abuse Act are separate and distinct. Section 15657.2 provides: "Notwithstanding this article, any cause of action for injury or damage against a health care provider, as defined in Section 340.5 of the Code of Civil Procedure, based on the health care provider's alleged

9.

professional negligence, shall be governed by those laws which specifically apply to those professional negligence causes of action."

In *Delaney v. Baker* (1999) 20 Cal.4th 32, our Supreme Court discussed the relationship between section 15657, establishing a cause of action for elder abuse, and section 15657.2, exempting causes of action for professional negligence from causes of action under section 15657. There plaintiff's 88-year-old mother died in a nursing home due to neglect. Plaintiff sued the nursing home and its administrators alleging negligence and elder abuse. The jury found for plaintiff on both causes of action. In the elder abuse cause of action, the jury found the defendants were reckless. The jury awarded damages and the court awarded attorney fees under the Elder Abuse Act. (§ 15657, subd. (a).)

In upholding the award under the Elder Abuse Act, the court rejected the defendant's argument that " 'based on . . . professional negligence,' used in section 15657.2, applies to any actions directly related to the professional services provided by a health care provider." (*Delaney v. Baker*, *supra*, 20 Cal.4th at p. 35.) Instead, the court distinguished between professional negligence and reckless neglect. The court stated:

"In order to obtain the remedies available in section 15657, a plaintiff must demonstrate by clear and convincing evidence that defendant is guilty of something more than negligence; he or she must show reckless, oppressive, fraudulent, or malicious conduct. The latter three categories involve 'intentional,' 'willful,' or 'conscious' wrongdoing of a 'despicable' or 'injurious' nature. [Citations.]

" 'Recklessness' refers to a subjective state of culpability greater than simple negligence, which has been described as a 'deliberate disregard' of the 'high degree of probability' that an injury will occur (BAJI No. 12.77 [defining 'recklessness' in the context of intentional infliction of emotional distress action]); see also Rest.2d Torts, § 500.) Recklessness, unlike negligence, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a 'conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it.' " (*Delaney v. Baker*, *supra*, 20 Cal.4th at pp. 31-32, quoting Rest.2d Torts, § 500, com. (g), p. 590.)

The court concluded that because the jury found reckless neglect, and not merely professional negligence, plaintiff was not bound by the laws applicable to professional negligence but could avail herself of the enhanced remedies of section 15657 of the Elder Abuse Act. (*Delaney v. Baker*, *supra*, 20 Cal.4th at p. 35; see also *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771 [Code of Civil Procedure section 425.13, applicable to punitive damages in actions based on "professional negligence," not applicable to Elder Abuse Act].)

Here, as in *Delaney*, the jury found both professional negligence and reckless neglect. Under *Delaney*, Plaintiffs are not bound by the laws specifically applicable to professional negligence. That includes MICRA and the one-year limitation of actions contained therein. Although Plaintiffs' cause of action based on professional negligence may be barred by the statute of limitations, their cause of action for elder abuse is not.

# II
## *Substantial Evidence of Elder Abuse*

Aurora and Signature contend that as a matter of law Plaintiffs have failed to establish a right of recovery for elder abuse.

Aurora and Signature's contention amounts to nothing more than that the judgment is not supported by substantial evidence. They hope to prevail by presenting a view of the evidence in a light most favorable to themselves. But that is not how we view the evidence.

Because Plaintiffs must prove elder abuse by clear and convincing evidence, the standard is "whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) We must affirm if any reasonable trier of fact could have made the required findings. (*Ibid.*) The standard necessarily requires that we give appropriate deference to a view of the evidence most favorable to the judgment and not view the evidence in a light most favorable to the losing party, as Aurora and Signature seem to suggest.

## *(a)  Neglect*

Aurora and Signature contend that as a matter of law there is no evidence of neglect. Section 15610.57, subdivision (b)(3) defines "neglect" as including "[f]ailure to protect from health and safety hazards."

It is beyond dispute that Valencia was a hazard to the health and safety of female patients under Aurora and

12.

Signature's care, and that they failed to protect those patients from that hazard.

Aurora and Signature cite *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 406-407, for the proposition that neglect occurs only where the defendant "denied or withheld goods or services necessary to meet the elder or dependent adult's basic needs." But to the extent *Carter* can be read as holding that neglect does not include the failure to protect from health and safety hazards, we decline to follow it as directly conflicting with section 15610.57, subdivision (b)(3).

The only question here is whether clear and convincing evidence shows Aurora and Signature were reckless in their failure to protect.

### (b) Reckless

"Recklessness" means the deliberate disregard of the high degree of probability that an injury will occur. (*Delaney v. Baker*, *supra*, 20 Cal.4th at p. 31.) It rises to the level of a conscious choice of a course of action with knowledge of the serious danger to others. (*Id.*, at pp. 31-32.)

Aurora and Signature were well aware that their female patients were particularly vulnerable to sexual predation by male mental health workers. If they did not know before the Bravo incident, they certainly knew thereafter. Aurora and Signature are sophisticated parties. They are part of an organization that operates 11 psychiatric hospitals nationwide. It is reasonable to conclude that they know how to operate in a manner that protects their patients from sexual predation. Yet Aurora and Signature adopted policies that exposed their patients to a high degree of risk of sexual predation.

13.

One such policy was to hire unlicensed mental health workers. Aurora and Signature knew or should have known that their ability to do background checks on such workers is limited. Instead, they could have hired CNA's who are trained, licensed, and fingerprinted, and subject to unlimited background checks.

Valencia's training was minimal, consisting of a three- to five-minute talk and two days of following another worker around. Aurora employees did not know what countertransference is. Valencia was never tested to see if he knew what it was. After the Bravo incident, Aurora's director of clinical services recommended that the hospital increase education to improve therapeutic boundaries. Aurora's CEO told her that Signature would not pay for it.

Hospital policy allowed a male worker up to 20 minutes alone with a female patient in her room. The charge nurse cannot see inside the rooms from her station. One must enter into the room to see what is happening inside. Even walking down the hallway is not sufficient. The hospital is consistently understaffed. Supervisors change patients' acuity ratings to justify understaffing. A reasonable conclusion is that understaffing prevents workers from noticing what other workers are doing. The situation is perfect for a sexual predator. That male workers were allowed 20 minutes alone with a vulnerable female psychiatric patient in a room secluded from view would by itself support a finding of recklessness.

This is not a case of a momentary failure in an otherwise sufficient system. Valencia was allowed to prey upon three different women. It is reasonable to conclude that had Valencia not been improvident enough to be seen at a private party with a

14.

woman who had been discharged the day before, he would have continued to work at Aurora and claim other victims.

The flaws in Aurora and Signature's policies were so obvious that the jury could conclude that they intentionally turned a blind eye to the high probability of harm. Even when Aurora was informed that Valencia was known as "Rapey Juan," the reaction was a shrug. There is more than ample evidence to support a finding of recklessness under the clear and convincing standard.

III

*Instructions*

Aurora and Signature challenge several jury instructions.

*(a) Duty to Investigate*

Regarding Valencia's prior arrest and conviction, the trial court instructed the jury:

"Penal Code section 290 is the Sex Offender Registration Act, which includes a list of sex crimes for which registration as a sex offender is required.

"Those crimes include Penal Code section 289(a) sexual penetration with another person who is under 18 years of age.

"An investigative consumer reporting agency may not make or furnish any investigative consumer report containing records of arrest or conviction of a crime that are more than seven years old. . . .

"An employer that does not use the services of an investigative consumer reporting agency is not limited by how far back they may go in collecting an applicant's criminal history.

"Every person in this state, including limited liability companies, has a fundamental and necessary right to access

15.

public records.  Public records include county courthouse criminal history records.

"The Department of Justice maintains criminal history information.  State summary criminal history information means the master record of information compiled by the Attorney General pertaining to criminal history of a person, such as dates of arrest."

Aurora and Signature contend that they had no right, and therefore no duty, to search for criminal records more than seven years old.

Aurora and Signature rely on the Investigative Consumer Reporting Agencies Act.  (Civ. Code, § 1786 et seq.)  The act prohibits an investigative consumer reporting agency from furnishing a report containing a record of arrest or conviction that antedates the report by more than seven years.  (*Id.*, § 1786.18, subd. (a)(7).)  But the act applies only to investigative consumer reporting agencies.  Nothing prevents Aurora or Signature from going beyond seven years to search for arrests and convictions.

In fact, Labor Code section 432.7 recognizes the special need of health care facilities to conduct employment background investigations to protect the safety of their patients.  Subdivision (a) of the section prohibits an employer from asking an employee to disclose any arrest that did not result in a conviction or any conviction that has been dismissed or sealed.  But subdivision (f)(1)(A) of Labor Code section 432.7 provides, in part:  "[T]his section does not prohibit an employer at a health facility, as defined in Section 1250 of the Health and Safety Code, from asking an applicant for employment . . . the following:  [¶]  (A) With regard to an applicant for a position with regular access to

16.

patients, to disclose an arrest under any section specified in Section 290 of the Penal Code." Labor Code section 432.7, subdivision (f)(1)(A) places no time limit on the search.

Nor were Aurora and Signature confined to using investigative consumer reporting agencies. Every person has the right to inspect any public record. (Gov. Code, § 6253, subd. (a).) Records of arrests and convictions are part of the public record. (*Id.*, § 6252, subd. (e); see *Central Valley Ch. 7th Step Foundation, Inc. v. Younger* (1989) 214 Cal.App.3d 145, 158 [records of arrests kept by the California Department of Justice for offenses specified in Penal Code section 290 are discoverable by health facility pursuant to Labor Code section 432.7]; see also *Weaver v. Superior Court* (2014) 224 Cal.App.4th 746, 749-750 [various documents filed and received by the court represent the official work of the court in which the public has a justifiable interest].)

Aurora and Signature argue that Labor Code section 432.7, subdivision (f)(1)(A) only permits a health facility to inquire; it does not impose a duty to inquire. That is true enough. But a health facility has a duty to keep its patients safe. The trial court's instructions tell the jury it can decide whether Aurora and Signature breached the duty to provide safety by, among other matters, failing to conduct a full investigation as the law permits. The court did not instruct the jury that Aurora and Signature had the duty to inspect the public record; only that they had the right to.

Aurora and Signature argue that the instructions run counter to former California Code of Regulations, title 2, section

17.

7287.4, subdivision (d)(1)(B).[3]  That subdivision begins, "Except as otherwise provided by law (e.g., . . . Labor Code Section 432.7)," it is unlawful for an employer to inquire of an applicant regarding any conviction for which the record has been "judicially ordered sealed, expunged or statutorily eradicated."  (*Ibid.*)

First, the regulation is expressly subject to Labor Code section 432.7.  Even if the regulation had contained no such expression, an administrative regulation could not override the Labor Code.

Second, Valencia's conviction was not sealed, expunged, or statutorily eradicated.  It was reduced to a misdemeanor pursuant to Penal Code section 17(b) and dismissed pursuant to Penal Code section 1203.4.

The trial court's instructions were accurate.

### (b)  Staffing Ratios

Aurora and Signature contend the trial court erred in instructing with a staffing regulation.

The trial court instructed:  "The licensed nurse-to-patient ratio in a psychiatric unit shall be 1 to 6 or fewer at all times.  For purposes of psychiatric units only, licensed nurse[s] also include psychiatric technicians in addition to licensed vocational nurses and registered nurses."

The instruction is taken verbatim from California Code of Regulations, title 22, section 70217, subdivision (a)(13).  Aurora's own expert testified that title 22 regulations apply to Aurora.

---

[3] Former California Code of Regulations, title 2, section 7287.4 was in effect when Valencia was hired.  It was renumbered without substantive change on October 3, 2013, as California Code of Regulations, title 2, section 11017.

18.

Aurora argues the instruction is not supported by expert testimony. Aurora points to the testimony of its experts that the regulation applies only to a psychiatric unit and not to a free-standing psychiatric hospital as Aurora.

But section 70217 of the California Code of Regulations applies by its terms to all hospitals. It makes no distinction between psychiatric units in free-standing psychiatric hospitals and psychiatric units in other types of hospitals. By the plain terms of the regulation, it applies to Aurora. No expert testimony is required to support it.

*(c) Refused Remedial Instruction*

Aurora and Signature contend the trial court erred in refusing the following proposed instructions: "When considering the question of negligence, you must not consider whether or not Aurora Vista Del Mar or Signature Health made any reports of the events involving Juan Valencia to the Joint Commission (JCAHO), California Department of Public Health (CDPH) or any other law enforcement or licensing agency."

But the obvious purpose of regulations requiring such reports is to protect patient safety. Aurora's failure to make a timely report is simply evidence of a lack of concern for patient safety. It is relevant to show neglect, that is, the failure to protect patients from health and safety hazards. The trial court did not err in refusing the proposed instruction.

IV

*Excessive Damages*

Aurora and Signature contend the damages are excessive.

Aurora and Signature argue that all the compensatory damages awarded to Plaintiffs are noneconomic damages. Aurora and Signature rely on section 15657, subdivision (b) for

19.

the proposition that Plaintiffs' noneconomic damages are limited to $250,000 each.

Section 15657, subdivision (b) provides: "The limitations imposed by Section 377.34 of the Code of Civil Procedure on the damages recoverable shall not apply. However, the damages recovered shall not exceed the damages permitted to be recovered pursuant to subdivision (b) of Section 3333.2 of the Civil Code."

Civil Code section 3333.2, subdivision (b), part of MICRA, limits noneconomic damages to $250,000. But under the Elder Abuse Act, that limitation does not apply to living Plaintiffs.

Code of Civil Procedure section 377.34[4] prohibits damages for noneconomic loss in actions on behalf of decedents. The first sentence of section 15657, subdivision (b) provides that the limitation of section 377.34 does not apply to actions under the Elder Abuse Act. The second sentence of the subdivision begins with "However." (§ 15657, subd. (b).) It modifies the first sentence. Thus, the second sentence of the subdivision, limiting the amount of noneconomic damages, only applies to the first sentence relating to causes of action brought on behalf of decedents. Because in this action Plaintiffs are alive, the limitation of noneconomic damages in section 15657, subdivision (b) does not apply.

---

[4] Code of Civil Procedure section 377.34 provides: "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement."

The Elder Abuse Act provides enhanced remedies for victims. A prevailing plaintiff is entitled to an award of attorney fees. (§ 15657, subd. (a).) A deceased victim's successor is entitled to an award of some noneconomic damages. (*Id.*, subd. (b).) There is no basis for interpreting the Elder Abuse Act as restricting an award of damages for those fortunate enough to have survived the abuse.

V

*Fault Allocation*

Aurora and Signature contend that they are entitled to a new trial because there is no substantial evidence to support the fault allocation.

We review an apportionment of fault for substantial evidence. (*Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 147.) Aurora and Signature argue that there is no basis in the evidence for allocating only 35 percent fault to Valencia, the person who played the most direct and active role in the injury. Aurora and Signature cite *Scott* for the proposition that an apportionment of fault is not supportable when it overlooks or minimizes the fault of the party who plays the most direct and culpable role in the injury. (Citing *id.*, at p. 148.)

But that is not what *Scott* says. In *Scott*, the county's department of children's services placed a child in the home of her grandmother. The grandmother intentionally scalded the child, causing severe injuries. A jury awarded substantial damages to the child, finding the grandmother 1 percent at fault and the county 99 percent at fault.

Although *Scott* concluded that placing only 1 percent of the fault on the grandmother was unsupported, the court had no problem with placing the great majority of the fault on the county

21.

that failed to protect the child. *Scott* said the circumstances resemble those in *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1238, where the court declined to disturb a jury's apportionment of 25 percent fault to an assailant who deliberately shot plaintiff and 75 percent fault to the employer's private security company who failed to protect him. (*Scott v. County of Los Angeles*, *supra*, 27 Cal.App.4th at p. 148, fn. 16.) *Rosh* expressly rejected the defendant's contention that no reasonable person could conclude a negligent tortfeasor was more responsible for an injury than an intentional tortfeasor. (*Rosh*, at p. 1233.)

Here Aurora and Signature are sophisticated parties who should know how to operate a psychiatric hospital to assure the safety of their patients. Instead, they operated the hospital recklessly and maliciously to make what happened almost inevitable. First, it was Bravo; then it was Valencia. If the perpetrator had not been Valencia, it would have been someone else. The jury correctly attributed 70 percent of the fault to Aurora and Signature.

## VI

### *Punitive Damages*

Signature contends the punitive damages award must be struck because there is no clear and convincing evidence of malice or oppression.

Exemplary damages may be awarded where the plaintiff proves by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice. (Civ. Code, § 3294, subd. (a).) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious

disregard of the rights or safety of others.  (*Id.*, subd. (c)(1).) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.  (*Id.*, subd. (c)(2).)

Signature relies on Civil Code section 3294, subdivision (b). That subdivision provides:  "An employer shall not be liable for [exemplary] damages . . . based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was *personally guilty of oppression, fraud, or malice*. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation."  (Italics added.)

Here there is clear and convincing evidence that Signature was personally guilty of oppression and malice.  Under Signature's management agreement with Aurora, Signature agreed to provide "[d]aily operational direction and management" and "[c]linical responsibility for all service programs."  The jury could reasonably conclude that it was Signature that set the policies that made sexual predation of patients almost inevitable, and that in setting those policies, it acted willfully and with a conscious disregard for the safety of others.

Indeed, a single incident illustrates both Signature's control and its willful and conscious disregard for the safety of others.  After the Bravo incident, Aurora's then director of clinical services recommended increased education of employees on

23.

clinical boundaries.  Aurora's CEO told her that Signature would not pay for it.

Moreover, Doctor Kim owns both Signature and Aurora. The jury could reasonably conclude that the owner was well aware of the policies that resulted in harm to Plaintiffs.

VII

*Motion for Nonsuit*

The trial court granted Aurora's motion for nonsuit on Plaintiffs' causes of action alleging vicarious liability under the doctrine of respondeat superior and ratification.[5]

A trial court properly grants a motion for nonsuit only if the evidence presented by the plaintiff would not support a verdict in the plaintiff's favor.  (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838.)  The trial court may not weigh the evidence, but must accept as true the evidence most favorable to the plaintiff and disregard conflicting evidence.  (*Ibid.*)

*(a)  Respondeat Superior*

Under the rule of respondeat superior, an employer is vicariously liable for the torts of its employees committed within the scope of employment.  (*John R. v. Oakland Unified School*

_____

[5] Plaintiffs argue the issue of respondeat superior is important because Civil Code section 1431.2 limits liability for noneconomic damages to several and not joint liability.  They point out Valencia was found 35 percent at fault.  They claim respondeat superior avoids the limits of Civil Code section 1431.2.  Plaintiffs raised Civil Code section 1431.2 for the first time in a petition for rehearing.  For the purposes of this appeal only, Plaintiffs waived the issue.  (See *CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1542.)  The waiver is without prejudice to raising the issue in an action to enforce the judgment.

24.

*Dist.* (1989) 48 Cal.3d 438, 447.) An employer may be vicariously liable for willful, malicious, even criminal acts, of an employee that are deemed to be committed within the scope of employment, even though the employer has not authorized such acts. (*Ibid.*) An act is within the scope of employment if the employment predictably creates the risk that employees will commit intentional torts of the type for which liability is sought. (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 299.)

Courts have generally held that an employer is not liable under the doctrine of respondeat superior for sexual assaults committed by an employee. (3 Witkin Summary of Cal. Law (11th ed. 2017) Agency and Employment, § 201, p. 263; but see *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 217 [city liable for assault by a police officer in view of the considerable power and authority a police officer possesses].) But a sexual tort will be considered to be within the scope of employment if "its motivating emotions were fairly attributable to work-related events or conditions." (*Lisa M. v. Henry Mayo Newhall Memorial Hospital*, *supra* 12 Cal.4th at p. 301.)

Thus, in *Lisa M. v. Henry Mayo Newhall Memorial Hospital*, *supra*, 12 Cal.4th 291, the court held that a hospital is not liable for a sexual assault committed by a technician under the pretense of conducting an ultrasound examination. The motivating emotions were not fairly attributable to work-related conditions. (*Id.* at p. 301.)

But this case is not like *Lisa M.* In that case the employee's interaction with the victim was brief and the employee's duties were technical. The circumstances of

25.

employment were highly unlikely to engender a personal relationship that might result in sexual exploitation.

In contrast, here there is sufficient evidence for a jury to conclude Valencia was acting within the scope of his employment. The duties of a mental health worker include helping patients with daily living activities. The workers are personally involved with the patients over an extended period of time. The patients are vulnerable; they may suffer from impaired judgment or other cognitive impairments. Sexual exploitation of the patients by employees is a foreseeable hazard arising from the circumstances of the job. That hazard was exponentially increased by Aurora's policies, including allowing male workers 20 minutes alone with patients and providing inadequate training on worker-patient boundaries.

In concluding that the ultrasound technician in *Lisa M.* was not acting within the scope of his employment, the court stated, "We deal here not with a physician or therapist who becomes sexually involved with a patient as a result of mishandling the feelings predictably created by the therapeutic relationship." (*Lisa M. v. Henry Mayo Newhall Memorial Hospital*, *supra*, 12 Cal.4th at p. 303.) Quite the contrary. That is what is happening here. Ample evidence supports a finding that Valencia was acting within the scope of his employment. The trial court erred in granting a judgment of nonsuit on the question.

The remedy requires that we reverse and remand for a new trial on the cause of action for which the trial court granted nonsuit. (See *McNall v. Summers* (1994) 25 Cal.App.4th 1300, 1315.) Plaintiffs request, however, that we simply amend the judgment to include a finding of respondeat superior. Plaintiffs

cite no authority for such a remedy nor are we aware of such authority. Aurora and Signature are entitled to a jury determination on the question whether Valencia was acting within the scope of his employment. We remand for a new trial.

*(b) Ratification*

As an alternative to respondeat superior, an employee may be liable for an employee's act where the employer subsequently ratifies the originally unauthorized tort. (*C.R. v. Tenent Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1110.) The failure to investigate or respond to charges that an employee has committed an intentional tort or the failure to discharge the employee may be evidence of ratification. (*Ibid.*) Generally, ratification is a question of fact. (*Ibid.*)

Here an Aurora employee informed a supervisor that Valencia's reputation among other employees was so bad he had earned the nickname "Rapey Juan." Aurora failed to undertake any investigation. Instead, Aurora continued to allow Valencia up to 20 minutes alone with vulnerable female patients in rooms that could not be observed from outside of the room. It is true that Aurora terminated Valencia soon after it learned that he was at a party with a recently discharged patient. But a jury could reasonably determine that Aurora should have acted to investigate sooner, when it first learned of Valencia's reputation as "Rapey Juan." An employer is not relieved of liability for ratification simply because it eventually terminates the employee.

There is substantial evidence from which a jury could have determined that Aurora ratified Valencia's acts.

## VIII

*Punitive Damages and Civil Code Section 1431.2*

For the first time in a petition for rehearing, Plaintiffs contend the award of punitive damages allows them to escape the limitation on joint and several liability in Civil Code section 1431.2, subdivision (a).[6] Matters raised for the first time in a petition for rehearing are deemed waived. (See *CAMSI IV v. Hunter Technology Corp.*, *supra*, 230 Cal.App.3d at p. 1542.) The waiver, however, is without prejudice to raising the issue in an action to enforce the judgment.

## DISPOSITION

The matter is reversed and remanded for a new trial on the issue of respondeat superior and ratification. In all other respects, the judgment is affirmed. Costs on appeal are awarded to Plaintiffs.

CERTIFIED FOR PUBLICATION.


GILBERT, P. J.

We concur:


YEGAN, J.


PERREN, J.

---

[6] Civil Code section 1431.2, subdivision (a) provides, in part: "In any action for personal injury, . . . based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint."

Kevin G. DeNoce, Judge

Superior Court County of Ventura

_____

Law Office of David Feldman and David Feldman for Plaintiffs and Appellants.

Horvitz & Levy, Andrea M. Gauthier, Bradley S. Pauley; Kendall Brill & Kelly, Nicholas F. Daum; Beach Law Group, Thomas E. Beach, Mindee J. Stekkinger and Molly M. Loy for Defendants and Appellants.

Cole Pedroza, Curtis A. Cole and Cassidy C. Davenport for California Medical Association, California Dental Association, and California Hospital Association as Amici Curiae on behalf of Defendants and Appellants.