Filed 9/24/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| A.H.,<br><br>　　　Plaintiff and Respondent,<br>v.<br><br>TAMALPAIS UNION HIGH SCHOOL DISTRICT,<br><br>　　　Defendant and Appellant. | A165493, A166684<br><br>(Marin County Super. Ct. No. CIV2001133) |

While a student at Tamalpais High School, A.H. was sexually abused by his school tennis coach Normandie Burgos. A.H. sued appellant Tamalpais Union High School District (District) for negligent supervision in failing to protect him from the abuse. At trial, A.H. argued District employees' failure to properly investigate a different student's earlier complaint that Burgos improperly touched him and their failure to properly supervise Burgos following the complaint "empowered" Burgos, resulting in his sexual abuse of A.H.

A jury found the District negligent and awarded A.H. damages of $10 million.

On appeal, the District raises two claims: first, that the trial court improperly instructed the jury and, second, that the trial court erred in allowing A.H. to present inadmissible evidence of Burgos's conduct with others. Finding no error, we affirm.

1

# FACTUAL AND PROCEDURAL BACKGROUND

A.H. was a student at Tamalpais High School from the fall of 2000 until he graduated in the spring of 2004. Normandie Burgos was hired as a full-time P.E. teacher at Tamalpais High School in 1998, and he also coached the tennis team.

While still in middle school, A.H. began taking private tennis lessons from Burgos, and he joined the Tamalpais High School tennis team as a freshman. A.H. viewed Burgos as a mentor and the "most important person in [his] life" other than his parents. Burgos began sexually abusing A.H. in 2003. The abuse took place in Burgos's office and later in the coaches' locker room, both of which were next to the school's boys' locker room.

In 2020, A.H. filed a complaint against the District asserting a single claim of negligence.[1] A.H. alleged the District's employees had a duty to protect A.H. from potential dangers on school grounds during school hours and they breached this duty by "failing to take appropriate action against Burgos for the multiple sexual misconduct complaints, failing to so detect and deter Burgos's sexual assaults, failing to properly supervise [A.H.] and Burgos so as to protect [A.H.] from being sexually assaulted, and thereafter, failing to timely repudiate Burgos's known misconduct so as to mitigate the emotional distress suffered by [A.H.]."

*Trial Evidence*

### 2002 Complaint Regarding Burgos and the District's Response

Chris Holleran was the principal of Tamalpais High School from 2001 to June 2008. He received a complaint about Burgos in November 2002, when a Mill Valley police detective told him she had received a report from a

---

[1] In the same complaint, A.H. asserted a claim of sexual assault against Burgos, but Burgos was dismissed from the case before trial.

2

student's therapist.  The student, a wrestler, told Holleran that Burgos took him into a room off the coach's office to measure his body fat.  Burgos reached down the front of the student's pants, purportedly to take a measurement of his upper thigh, and brushed the back of his hand against the student's genitals.[2]  According to Holleran, Burgos acknowledged taking the student's body fat measurements and was "vague about the issue of the groin area," although Burgos admitted it was possible he brushed against the student's genitals.

Holleran, who had taught P.E. and was familiar with body fat testing, had never heard of a P.E. teacher taking a student alone into an office to measure body fat and had never heard of a teacher taking body fat measurements on a student's upper thigh or lower abdomen, putting his hand down a student's pants to measure body fat, or accidentally touching a student's genitals during a body fat test.  In investigating the incident, Holleran did not talk with any students about their experiences with Burgos; nor did he speak with anyone in the P.E. department about rules or policies regarding body fat testing.

Holleran wrote an "Incident Report/Letter of Warning" to Burgos in December 2002, describing Burgos's conduct as "careless, highly inappropriate, and unjustifiable."  He wrote that Burgos's conduct "cause[d] the student emotional distress and has resulted in a hostile learning environment for the student."  Holleran directed Burgos "not to engage in similar activities under any circumstances" and "never to take body fat measurements of students in the thigh area."  Holleran also wrote that he

---

[2] Holleran described the measuring device Burgos used as "look[ing] like a microphone."  Another witness described it as a "wand."  At other times, Burgos used calipers for similarly invasive "body fat tests."

3

would "work with the physical education department to create written protocol for all body fat measurements in the future."

With the agreement of high-level administrators at the District, Holleran did not place this 2002 warning letter in Burgos's personnel file. Holleran testified he did not place the letter in the file because he believed the student's complaint represented an isolated incident and he "didn't have any evidence to say that there was intent." The document was kept in a locked file cabinet in Holleran's office, and he was the only person with access to it. Holleran did not tell the athletic director or any other P.E. teachers about the complaint. He did not tell his two assistant principals about the complaint and did not instruct them to supervise Burgos more carefully in any respect. Nor did he create a written protocol for body fat measurements. Holleran testified he did not write a protocol because BMI measurements were becoming more common and body fat testing "wasn't going to be relevant anymore."

Following the 2002 complaint, Holleran increased his "informal drop-ins" during the school day, meaning he "increased [his] presence" in the coaches' office area. But this was the only measure Holleran took to ensure Burgos did not touch students inappropriately.

Other Students' Experiences with Burgos, 1998 to 2001

A.H. presented evidence showing that the student's 2002 complaint was not based on an isolated incident. There were others.

A.G. graduated from Tamalpais High School in 2003. Sometime in 1999 to 2001, Burgos summoned A.G. into his office after P.E. class, told him to remove his shirt and pants for a body fat test, pulled the waistband of A.G.'s boxers, and pinched his skin about an inch above his penis. S.C., who played tennis at Tamalpais High School and graduated in 2002, recalled a

4

similar body fat test in Burgos's office. Burgos had S.C. take off his shirt and lower his pants and pinched his skin in different areas including "basically right in [his] pubic area, like right next to the shaft of [his] penis."[3] This happened sometime in 1998 to 2000. C.S., who graduated in 2004, recalled being alone with Burgos in his office for a body fat test during which Burgos lowered C.S.'s shorts and boxers to his ankles, so that C.S. was fully exposed. This occurred in 2000 or 2001. C.S. testified the body fat test was an uncomfortable experience, but his "friends and classmates . . . shared the experience and we discussed it amongst ourselves," which "normalized the experience."

J.L. graduated in 2003. Sometime in 1999 or 2000, Burgos told J.L. that the body fat tests taken in P.E. class were inaccurate and he needed to do it again. When J.L. was alone with Burgos in his office, Burgos had him take off his boxers and put on a blindfold. Then, while J.L. was naked and blindfolded, Burgos touched his testicles and moved his penis from side to side.

E.L. graduated in 2002. Multiple times, Burgos tested E.L.'s body fat, which involved E.L. being in his underwear and having measurements taken "near [his] genital area." E.L. recalled that wrestlers would line up outside Burgos's office to be tested. At some point in 1999 to 2001, Burgos offered to give E.L. a sports massage for his back injury. During the massage in Burgos's office, Burgos touched E.L.'s buttocks and told him to relax, which E.L. found alarming. E.L. also talked with other students on "several

---

[3] S.C. also recalled a friend on the tennis team telling him he got a deep tissue massage in Burgos's office and the friend was "surprised" and "thought it was a little bit weird afterwards."

5

occasions" about "how Burgos gave those tests and how uncomfortable they made people feel."

Burgos Sexually Abuses A.H. in 2003

A.H. testified he believed he was groomed by Burgos for sexual abuse. Burgos told A.H. that A.H. could tell him anything and that he was his friend.

In A.H.'s junior year, Burgos began sexually abusing A.H. under the guise of "stretching" tight muscles. At first, Burgos would massage A.H.'s elbow because he had tendonitis. In the spring of 2003, the massages progressed to include A.H.'s upper body, then lower body, and eventually Burgos was touching "the groin, the inner thigh and the pelvic area right above [A.H.'s] penis." Burgos touched A.H.'s penis multiple times during these massage/"stretching" sessions.

On one occasion, A.H. felt Burgos rubbing two fingers up and down the shaft of his penis. On another occasion, Burgos put a sleeping mask over A.H.'s eyes. Burgos told A.H. the mask would help him relax, but it terrified him. Burgos massaged A.H.'s inner thighs and lower abdomen and touched his penis. A.H. felt a "liquidy or moist sensation on the head of [his] penis." He thought, "What is going on," and, "I think I'm getting molested," over and over. Then A.H. heard someone trying to open the coaches' locker room, but it was locked.[4] Burgos quickly yanked the mask off his eyes, the door was unlocked, and the athletic director stepped in and asked Burgos what was going on. Burgos said he was doing stretches for A.H.'s back, and the athletic director recommended a stretching exercise.

---

[4] This was when A.H. realized Burgos had locked the door. Before that, he only thought the doors were closed.

2005 Complaint

Principal Holleran received a second complaint about Burgos in March 2005. The complaining student reported he felt uncomfortable when Burgos had him lower his waistband to take a body fat measurement. The incident occurred in the fall of 2004. The complaining student and another student wrote statements about Burgos giving them invasive body fat tests. Other than the complaining student, Holleran did not talk to any students about Burgos in 2005 even though the complaining student reported that three of his friends had similar uncomfortable experiences with Burgos and Holleran had a written statement from another student. Holleran believed Burgos's conduct constituted sexual harassment, and he was "very concerned" and "disappointed" and "frustrated that [Burgos] would do this again." He did not report the incidents to the police. In April 2005, the District issued Burgos a "Notice of Unprofessional Conduct and Improvement Plan," directing Burgos to refrain from taking any body fat measurements on students and to refrain from providing students physical therapy or assistance with stretching. Holleran did not notify any teachers about the 2005 complaint, and he took no additional action to supervise Burgos more closely beyond what he had done in response to the 2002 complaint from the student wrestler.

Closing Arguments

A.H.'s counsel asked in closing argument for a total verdict of $19.3 million and for an "extraordinary allocation" between the school district and Burgos of "90 percent Tamalpais and 10 percent Norm Burgos."

The District's counsel conceded in closing argument that Burgos sexually abused A.H. But the District's counsel spent most of her argument taking the position that the District was not negligent at all, or if it was, that the District's negligence was not a substantial factor in causing harm to A.H.

7

All of the blame was on Burgos. The District's counsel ended her closing argument by saying if the jury "disagree[d]" with her on these issues, the "case value" was a "total sum" of $250,000, and counsel "would suggest that an allocation of fault be attributed to Normandie Burgos. Although he's not a party in the case, his name is on the verdict form. . . . [¶] . . . [¶] So I would ask that an allocation of fault be attributed to Mr. Burgos in the 75 to 90 percent range."

*Verdict*

The trial court gave the jury the District's proposed special verdict questions on negligence. The jury was asked, "1. Was Defendant Tamalpais Union High School District negligent?" and, if the answer was yes, "2. Was Defendant Tamalpais Union High School District's negligence a substantial factor in causing harm to Plaintiff A.H.?" The jury answered, "Yes," to both questions. The jury found total noneconomic damages of $10 million, composed of $5 million for past noneconomic loss and $5 million for future noneconomic loss. The jury was asked "[w]hat percentage of responsibility for Plaintiff A.H.'s harm . . . [it] assign[ed] to" "(a) Tamalpais Union High School District" and "(b) Normandie Burgos," and the jury assigned 100 percent responsibility to the District and 0 percent to Burgos. [5]

---

[5] The first time the jury returned to the courtroom with a verdict, the clerk read the verdict and it was as we have described above. When the trial court asked whether any side wished to poll the jury, the District's counsel, without more, said yes. The polling for the total noneconomic damages came back 8-4 on each of the $5 million damages awards, but 9-3 on the total amount of $10 million. The judge, after conferring off the record at the bench with counsel, sent the jury back to deliberate and gave them a new verdict form. The jury came back shortly thereafter with their completed verdict form; the questions were all answered the same as before. The jury was polled again. This time the court accepted the verdict and discharged the jury. No one raised any issue about the jury's verdict on allocation of

8

**DISCUSSION**

A.   *Jury Instructions*

The District contends the trial court improperly instructed the jury on crucial issues, and the error was prejudicial because it resulted in a "legally impossible" verdict.  We find no instructional error.

1.   Standard of Review

"The propriety of jury instructions is a question of law that we review de novo."  (*D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 232.)  "When a party challenges a particular jury instruction as being incorrect or incomplete, 'we evaluate the instructions given as a whole, not in isolation.' "  (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence.  The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case."  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.)

On the other hand, " '[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given.' "  (*Red Mountain, LLC. v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 360 (*Red Mountain*).)  "The court is not required to instruct in the specific words requested by a party so long as the jury is adequately instructed on the applicable law.  [Citations.]  Nor is it

_____

responsibility (question 4) in connection with the taking or the re-taking of the verdict or the discharge of the jury.  And no one filed a motion for new trial.

9

error to refuse an instruction excerpting specific language from an opinion if the principle expressed by the excerpted language is encompassed by the more general instruction already given." (*Traxler v. Varady* (1993) 12 Cal.App.4th 1321, 1332–1333.)

### 2. Applicable Legal Principles

Pursuant to Government Code section 815.2, subdivision (a) (section 815.2(a)), a "public entity," such as the District, "is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."

If a teacher sexually abuses a student, the school district that employs the teacher is not liable for the teacher's conduct under section 815.2(a) because such conduct is not within the scope of employment. (*Roe v. Hesperia Unified School District* (2022) 85 Cal.App.5th 13, 25 (*Hesperia*); *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 875 (*C.A.*); *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 441 (*John R.*).) But the same school district may be held liable if its supervisory employees were negligent in hiring and supervising the abusive teacher and that negligence resulted in the student's harm. (See *Hesperia*, at p. 25 ["Because sexually abusing a student is not within the course and scope of employment of a school district employee, a school district is not vicariously liable for the abuse itself but may be liable for such things as negligent hiring, retention, or supervision."]; *C.A.*, at p. 875 [a student stated a claim against a school district under section 815.2 where he alleged school administrators "knew or should have known of [a counselor]'s dangerous propensities, but nevertheless hired, retained and failed to properly supervise her," and the

10

counselor then abused the student]; *John R.*, at pp. 452–453 [while the plaintiffs could not state a claim for injury resulting from a teacher's sexual abuse "premised on a theory of vicarious liability under the respondeat superior doctrine," the plaintiffs were free to pursue claims against the school district "premised on its own direct negligence in hiring and supervising the teacher"].)

In *C.A.*, *supra*, 53 Cal.4th 861, our high court explained that a school district's potential for negligence liability when a teacher abuses a student is based on the district's employees' special relationship with its students and the duty to protect students that arises from that special relationship.[6] (*Id.* at pp. 869–870.) In the case of "[s]chool principals and other supervisory employees, to the extent their duties include overseeing the educational environment and the performance of teachers and counselors, [these supervisory employees] also have the responsibility of taking reasonable measures to guard pupils against harassment and abuse from foreseeable sources, including any teachers or counselors they know or have reason to know are prone to such abuse." (*Id.* at p. 871.) When a school district's supervisory employees breach this duty to protect students from a teacher they know or should know is prone to abuse students, the district can be held "liable under a vicarious liability theory encompassed by section 815.2." (*Id.* at p. 875).

---

[6] The court explained the special relationship—which is " 'analogous in many ways to the relationship between parents and their children' "—arises "from the mandatory character of school attendance and the comprehensive control over students exercised by school personnel." (C.A., *supra*, 53 Cal.4th at p. 869.)

3.    Instructions Given

The jury in this case was instructed with CACI Nos. 400 (negligence—essential factual elements), 401 (basic standard of care), 402 (standard of care for minors), 406 (apportionment of responsibility), 412 (duty of care owed children), 413 (custom or practice), 426 (negligent hiring, supervision, or retention of employee), 430 (causation: substantial factor), 431 (causation: multiple causes).[7]

The trial court also instructed the jury with language from a special instruction proposed by the District and language proposed by the District in response to one of A.H.'s proposed special instructions (which was not given).

For CACI No. 426, the jury was instructed: "[A.H.] claims that he was harmed by one or more employees of the Tamalpais Union High School District and that the Tamalpais Union High School District is responsible for the harm because one or more of its employees negligently supervised and/or retained Normandie Burgos. To establish this claim, [A.H.] must prove all of the following:

"1. Normandie Burgos was or became unfit to perform the job for which he was hired;

"2.  One or more employees of the Tamalpais Union High School District knew or should have known that Normandie Burgos was unfit and that this unfitness posed a particular risk to others;

"3. That Normandie Burgos' unfitness harmed [A.H.]; and

"4. That one or more employees of the Tamalpais Union High School District's negligence in retaining or supervising Normandie Burgos was a substantial factor in causing [A.H.]'s injuries."

---

[7] The District proposed giving these CACI instructions *except* for Nos. 412 and 426.

Based on the District's proposed special instruction no. 2, the trial court further instructed the jury: "A district's liability must be based on evidence of negligent hiring, supervision or retention, not on assumptions or speculation[]. That an individual school employee has committed sexual misconduct with a student or students does not of itself establish or raise any presumption that the employing district should bear liability for the resulting injuries."[8]

The court also gave the following instruction proposed by the District: "The District's duty of supervision was limited to the risks of harm that were reasonably foreseeable, i.e., that were known to the District or that reasonably should have been known to the District."

_____

[8] This language was taken from *C.A.* There, the court considered "the value of negligence actions in providing compensation to injured parties and preventing future harm of the same nature" and concluded that "these remedial goals are best addressed 'by holding school districts to the exercise of due care' in their administrators' and supervisors' 'selection of [instructional] employees and the close monitoring of their conduct,' rather than by making districts vicariously liable for the intentional sexual misconduct of teachers and other employees. (*C.A.*, *supra*, 53 Cal.4th at p. 878, citing *John R.*, *supra*.) The court continued, "At the same time, we emphasize that *a district's liability must be based on evidence of negligent hiring, supervision or retention, not on assumptions or speculation. That an individual school employee has committed sexual misconduct with a student or students does not of itself establish, or raise any presumption, that the employing district should bear liability for the resulting injuries*. We note, as well, that even when negligence by an administrator or supervisor is established, the greater share of fault will ordinarily lie with the individual who intentionally abused or harassed the student than with any other party, and that fact should be reflected in any allocation of comparative fault." (*C.A.*, *supra*, 53 Cal.4th at pp. 878–879, italics added.)

4. <u>Analysis</u>

The District argues the trial court improperly instructed the jury because it failed to instruct (1) that the District could not be held vicariously liable for Burgos's conduct of sexually abusing A.H. because such conduct is not within the scope of the employment and (2) that the District could only be held liable for the conduct of its supervisory employees.

We disagree there was error. First, the trial court instructed (as the District proposed in its special instruction no. 2) that the fact "an individual school employee has committed sexual misconduct with a student or students does *not of itself establish or raise any presumption* that the employing district should bear liability for the resulting injuries." (Italics added.) Thus, the jury was told that it could *not* hold the District liable for the harm caused by Burgos's sexual misconduct on the ground Burgos was a District employee (in other words, the District could not be held vicariously liable for Burgos's conduct).

Second, CACI No. 426 instructed that A.H. claimed the District was liable for his harm "because one or more of its employees negligently *supervised and/or retained* Normandie Burgos" and, to prove this claim, A.H. had to show, among other things, that the "District's negligence in *retaining* or *supervising* Normandie Burgos was a substantial factor in causing [A.H.]'s injuries." (Italics added.) The court further instructed the jury (again, at the District's request) that any liability on the part of the District "must be based on evidence of negligent hiring, *supervision or retention*, not on assumptions or speculations" and the District's "duty of *supervision* was limited to the risks of harm that were reasonably foreseeable, i.e., that were known to the District or that reasonably should have been known to the District." (Italics added.) Thus, it was clear to the jury that the District

14

could be liable for A.H.'s harm only if one or more of its employees were negligent in supervising or retaining Burgos and that negligence "was a substantial factor in causing" his harm. It was not necessary for the trial court to additionally instruct that the District could only be liable for the conduct of its "supervisory employees" because any employee who was negligent in supervising or retaining Burgos would be, by definition, a supervisory employee.

The District faults the trial court for refusing to give its proposed special instruction No. 1, which provided: "No Liability For Criminal Acts [¶] The Tamalpais Union High School District is not responsible for the criminal conduct of Normandie Burgos. The District is only liable if it was negligent and such negligence was a substantial favor [*sic*] in causing injury to A.H." (Some capitalization omitted.)

We find no error in the trial court's refusal to give the instruction because its subject matter was " 'substantially covered by the instructions given.' " (*Red Mountain, supra,* 143 Cal.App.4th at p. 360.) Specifically, CACI No. 426 and the language from the District's proposed special instruction no. 2 adequately instructed on the legal principles addressed by proposed special instruction No. 1.[9]

Next, the District argues the trial court erred in not giving the last sentence of its proposed special instruction no. 2, which read: "We note, as

---

[9] Moreover, we agree with the trial court that the proposed instruction could "be confusing to the jury as drafted." The title is "No Liability For Criminal Acts," but it is not the case that the District could not be held liable for A.H.'s harm if Burgos committed criminal acts. As the jury instructions properly explained, the District could be liable for A.H.'s harm if its employees negligently supervised or retained Burgos and that negligence was a substantial factor in causing A.H.'s harm. This is so even if Burgos engaged in criminal conduct.

15

well, that even when negligence by an administrator or supervisor is established, the greater share of fault will ordinarily lie with the individual who intentionally abused or harassed the student than with any other party, and that fact should be reflected in any allocation of comparative fault." The District took this sentence verbatim from the California Supreme Court's observation made in weighing policy considerations before concluding that "a public school district may be vicariously liable under section 815.2 for the negligence of administrators or supervisors in hiring, supervising and retaining a school employee who sexually harasses and abuses a student" (*C.A.*, *supra*, 53 Cal.4th at pp. 878–879). (See fn. 8, above.)

The trial court declined to give this statement as a jury instruction, explaining, "I don't see that that's creating an actual standard, but it is a commentary or a comment made by the Supreme Court regarding what happens at times." We agree with the trial court. That the abuser "ordinarily" will be assigned a greater share of fault than the entity that negligently supervised the abuser is not a rule of law; it is simply an observation. CACI No. 406 (which the District requested) already correctly instructed the jury on apportionment. Instructing the jury with the proposed sentence would have been confusing and raised more questions. (Who is the "we" in this sentence? What does an "ordinary" case look like?) The trial court properly refused to give it. (See *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 595 [no error in refusing to give a proposed instruction that "had the potential of misleading the jury and did not provide a clear statement of the law"].)

Finally, the District argues it was confusing to give both CACI No. 400 on negligence and CACI No. 426 on negligent supervision. This argument fails because the District requested CACI No. 400 and did not object to giving

16

both instructions. (See *Green v. Healthcare Services, Inc.* (2021) 68 Cal.App.5th 407, 419 ["a party who acquiesces in the giving of a jury instruction may not later appeal the giving of that instruction"]; *People v. Lee* (2011) 51 Cal.4th 620, 638 ["failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal"].)

In summary, the District has failed to show instructional error. Consequently, we do not reach its argument that the asserted instructional error must have been prejudicial because the jury reached a "legally impossible" verdict by assigning 100 percent responsibility for A.H.'s harm to the District and 0 percent to Burgos. We note the District does *not* separately claim insufficiency of the evidence as to the jury's apportionment finding. (Cf. *Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1030 [holding a jury's verdict allocating 100 percent fault to the school district and none to the abusive teacher was not supported by the evidence].) "Issues do not have a life of their own: if they are not raised . . ., we consider [them] waived." (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99.) Accordingly, we do not consider whether the jury's apportionment of fault was supported by sufficient evidence.[10] Nor do we address A.H.'s argument that any error in connection with the verdict form was invited by the District.

B.   *Evidentiary Claims*

"As a general matter, evidence may be admitted if relevant (Evid. Code, § 350), and ' "[r]elevant evidence" means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the

---

[10] Our dissenting colleague takes a different view and would urge that we take the "extraordinary" step of reaching out to decide issues that the District (for what our colleague describes as "unfathomable reasons") never raised in the trial court and never raised on appeal. We decline to do so.

17

determination of the action' (*id.*, § 210). ' " 'The test of relevance is whether the evidence tends, "logically, naturally, and by reasonable inference" to establish material facts. . . .' " ' [Citation.] 'The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner.' " (*Coffey v. Shiomoto* (2015) 60 Cal.4th 1198, 1213.)

The District contends the trial court erred in allowing A.H. to present evidence of (1) Burgos's inappropriate conduct with others that occurred before A.H. was abused, (2) the 2005 complaint about Burgos related to conduct that occurred after A.H. was abused, and (3) Burgos's criminal conviction in 2019. We consider each of these claims in turn.

1. <u>Burgos's Conduct with Others, 1998 to 2001</u>

The District argues it was error to allow a number of witnesses[11] to testify about Burgos's inappropriate and abusive conduct in the late '90's and

---

[11] A.H. presented the testimony of five students (A.G., S.C., C.S., J.L., and E.L.) who testified about their experiences with Burgos in 1998 to 2001. At trial, A.H. also called a witness ("tennis student"), who did not attend Tamalpais High School but took private tennis lessons with Burgos at the high school's tennis courts, starting around 2000. The tennis student testified that Burgos touched him inappropriately in Burgos's office and the coaches' locker room on the Tamalpais High School campus and described Burgos putting a mask over his face and doing "stretching" and "massages" that involved massaging his testicles and penis and lasted 20 to 30 minutes. After he testified, the District objected that the tennis student's testimony was irrelevant because he was not a Tamalpais High School student. A.H.'s attorney responded that his testimony was relevant both to support A.H.'s credibility (because the tennis student described "nearly identical" conduct by Burgos) and to support the claim of "lack of supervision" (since the tennis student's testimony showed Burgos was able to molest him on campus "behind closed doors, in the coaches' locker room"). After the District's attorney stated he did not intend to attack A.H.'s credibility, the trial court

18

early 2000's because none of these witnesses reported Burgos's conduct to anyone at Tamalpais High School when it occurred and, therefore, their testimony was irrelevant to A.H.'s claim of negligent supervision.

The trial court ruled the evidence was relevant to show "what the District should have known, what the District had reason to know" and was "relevant to proving or disproving a lack of supervision."

As we have described, our high court in *C.A.* held a school district can be held liable for negligent supervision when its supervisory employees "knew or *should have known* of [a school employee's] dangerous propensities, but nevertheless hired, retained and failed to properly supervise her." (*C.A.*, *supra*, 53 Cal.4th at p. 875, italics added.) "The negligence standard articulated by *C.A.* for hiring, supervising, or retaining [a dangerous] employee . . . thus imposes liability on a school district on the basis of supervisory personnel's constructive knowledge that an employee is prone to harm students. Constructive knowledge is knowledge that 'may be shown by circumstantial evidence "which is nothing more than one or more inferences which may be said to arise reasonably from a series of proven facts." ' " (*Hesperia*, *supra*, 85 Cal.App.5th at p. 26.)

Here, the students' experiences with invasive "body fat tests," C.S.'s discussions with friends and classmates who had the same experience with Burgos, E.L.'s similar conversations with students about "how Burgos gave those tests and how uncomfortable they made people feel," and E.L.'s description of wrestlers waiting outside Burgos's office for body fat tests all

---

ruled it would exclude the tennis student's testimony under Evidence Code section 352. The trial court then instructed the jury to disregard the tennis student's testimony and also told the jury that the District did not challenge A.H.'s credibility as it related to his claimed abuse.

suggest Burgos's misconduct was pervasive or, at the very least, well-known among male students. As A.H. argues, this evidence was relevant to show what District supervisory employees should have known about Burgos; Principal Holleran would have discovered Burgos's propensity to abuse boys had he properly supervised him before the 2002 complaint, conducted an adequate investigation following the 2002 complaint, or reasonably supervised Burgos after the 2002 complaint. The trial court did not abuse its discretion in admitting this evidence.

The District cites *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 396, disapproved of on another point by *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 222, fn. 9, for the proposition that evidence of an employee's misconduct "could not be used to impose liability for negligent supervision on the employer, who had no actual knowledge or *reason to suspect* these incidents had occurred." (Italics added.) But, in this case, it could be inferred that District supervisory employees did have reason to suspect Burgos was abusing boys, considering the 2002 complaint and the frequency of his misconduct.

    2.    <u>2005 Complaint</u>

The District argues evidence of Burgos's misconduct that occurred after A.H. graduated was irrelevant. A.H. responds that the 2005 complaint (which involved reports of invasive body fat tests from two students, one of whom said three of his friends had similar uncomfortable experiences with Burgos) and the District's response was relevant to show lack of reasonable supervision of Burgos following the 2002 complaint. He also argues the evidence was relevant to rebut Holleran's claim that he did not create a written protocol for measuring body fat because the test was being phased out and replaced by BMI measurements.

We agree with A.H.  In 2002, Holleran knew that Burgos touched a student inappropriately during a highly unusual body fat test.  Holleran believed Burgos's conduct created a hostile learning environment for the student, and he told Burgos he would create a written protocol for taking body fat measurements.  Evidence that Holleran failed to create a written protocol and that Burgos continued to touch multiple students inappropriately under the guise of measuring body fat in 2004 was relevant to the question whether District supervisory employees responded adequately to the 2002 complaint and whether they properly supervised Burgos after the 2002 complaint.  Again, we conclude the trial court did not abuse its discretion in admitting this evidence.

### 3. Burgos's Criminal Trial in 2019

#### a. *Background*

A.H. testified at length about the lasting harm he has suffered as a result of the sexual abuse.  In college, he had nightmares of Burgos trying to kill him.  He would cry for an hour at night.  He did not want to tell anyone what happened to him because he knew it would be humiliating and he was worried it would ruin his life, but he thought he had a duty to protect others from Burgos.  A.H. reported Burgos to the police in 2006.  Burgos was arrested, and A.H. testified at the preliminary hearing and criminal trial.  At the preliminary hearing in 2007, the Tamalpais High School tennis coach who had taken over after Burgos was arrested, current members of the tennis team wearing their tennis gear, and former teammates attended and laughed at A.H. when he testified.  At the criminal trial in 2010, A.H. felt "further humiliated" because the defense presented him as homophobic and jealous of other players' success.  The trial ended with a hung jury.

21

A.H. testified that the greatest harm stemming from the abuse is that he hates himself, feels unworthy of love, and feels that he has failed his family, his community, and himself.

In 2017, Burgos was arrested in Contra Costa County for sexually assaulting children. When A.H. heard about the arrest, he called the prosecutor and offered to be a witness.[12] At Burgos's trial in 2019, the same defense attorney who had cross-examined A.H. in 2010 was brought in to cross-examine him again. The trial "brought [A.H.] some relief," but he still felt guilty that Burgos had victimized more children; he testified, "[T]he whole reason I testified the first time was to prevent that from ever happening, and I failed."

A.H.'s treating therapist testified that Burgos's criminal charges in 2017 "brought up a lot of triggers for [A.H.]," and he was experiencing nightmares, panic attacks, anxiety, and stress.

b. *Analysis*

The District argues evidence that Burgos was convicted of molesting children in another county years after his employment with the District had been terminated was not relevant to the question of negligence. A.H. responds that his testimony was relevant to the issue of damages.

In arguing motions in limine, the District's attorney similarly argued the Contra Costa County criminal trial and conviction were irrelevant because the District had no duty to supervise Burgos after he left its employment. A.H.'s attorney explained then that the evidence was relevant

---

[12] A.H. is a prosecutor, and he knew that in criminal trials involving sex crimes, prior acts by the defendant are admissible to corroborate current victims' testimony.

to damages because the recent criminal trial was "retriggering" for A.H. and "harming him again."

The trial court ruled that evidence of the recent criminal trial would be limited to (1) that A.H. testified in Burgos's criminal trial, (2) that Burgos was convicted, and (3) that the trial and conviction "had an impact on [A.H.] psychologically during this period having to have to think about these topics again and talk about this again." On appeal, the District does not address whether the evidence was relevant to the issue of damages. We conclude the evidence was relevant to damages and see no abuse of discretion in the trial court's evidentiary ruling.

## DISPOSITION

The judgment is affirmed.

_____

Miller, J.

I CONCUR:


_____

Stewart, P.J.


A166684, A165493, *A.H. v. Tamalpais Union High School District*

A165493, A166684, *A.H. v. Tamalpais Union High School District*
Dissenting opinion of Richman, J.

I respectfully dissent.

Justice Miller has, as all would expect, well written a comprehensive opinion that analyzes under settled principles of appellate review the arguments put forth by the District, and concludes they have no merit. I agree. Indeed, I agree with all 22-and-a-half pages of the substance of her opinion, which is fine, as far as it goes.

But there is where I part company with my colleagues. I would go further, and do something that to my knowledge this court has not done in my 18-and-a-half years' experience here: raise on our own, and seek supplemental briefing on, an issue "not proposed or briefed by any party." I would do this under the authority of Government Code section 68081, which provides in pertinent part as follows: "Before the Supreme Court, a court of appeal, or the appellate division of a superior court renders a decision in a proceeding other than a summary denial of a petition for an extraordinary writ, based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing." (See *Hibernia Savings & Loan Society v. Farnham* (1908) 153 Cal. 578, 584 ["This court . . . is undoubtedly at liberty to decide a case upon any points that its proper disposition may seem to require, whether taken by counsel or not . . . ."]; see also *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party" and "[w]hether or not it should do so is entrusted to its discretion"].)

The issue I would have briefed is whether the verdict allocating 100

1

percent responsibility for A.H.'s harm to the District, zero percent to Burgos, can support the judgment.

The District's first argument is that "The Failure to Properly Instruct the Jury Resulted in a Legally Impossible Verdict." And it is fair to say that the bulk of the District's opening brief is that the allocation to the District of 100 percent responsibility for A.H.'s harm, zero percent to Burgos, was "legally impossible." In this regard, the District seems to have made a strategic decision to attack the verdict and seek a new trial on *all* issues by arguing instructional error, and that the allocation on the verdict reflects the prejudice from that error. With this approach, for reasons best known to it— reasons unfathomable to me—the District did not make any alternative argument, for example, insufficiency of the evidence, and seek a new trial on the allocation issue.[1]

Despite that, I would raise the issue myself as, recognizing I do not have the benefit of A.H.'s briefing on the issue, my review of the law leads me to conclude that the judgment is based on a verdict that cannot stand.

By way of brief background, the jury was instructed that A.H. suffered

---

[1] This approach is similar to the District's conduct below, where it did not make a motion for new trial regarding any error in the verdict. (See Code Civ. Proc., § 657, subd. 6 ["The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: [¶] . . . [¶] 6. Insufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law"].)

Not only that, the jury had to be sent back to deliberate after the first poll of the jury came back 8-4 on the $10 million verdict and the jury was sent back for further deliberations. Yet no one raised the allocation issue, which could have easily been done during the taking and re-taking of the verdict.

"harm," and claims he was harmed by sexual battery. The jury was further instructed that A.H.'s damages were non-economic, and included past and future mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress.

A.H.'s closing argument described how he was on the stand for three and a half hours explaining "how much this has affected him," describing "the abuse as affecting [A.H.] professionally." A.H. was "sexually naïve, totally innocent. And this man took away that innocence." And, counsel added, A.H. "has reminders of the abuse virtually every day," going on to quote A.H. that he "just wish[ed] [he] could go back to the moment [he] met Burgos." Finally, in addressing the issue of allocation, counsel said, "Mr. Burgos did the molesting, and he should be held responsible to some degree," and went on to ask for "an extraordinary allocation here between the fault of the District and the perpetrator. And that allocation: 90 percent Tamalpais and 10 percent Norm Burgos."

So, the harm was a sexual battery. And the sexual batterer was Burgos.

The jury went beyond the "extraordinary" request by counsel for A.H., and allocated 100 percent of responsibility for the harm to the District, zero to Burgos. That cannot be: if Burgos's sexual battery did not harm A.H., then the District could not have been negligent in hiring him or failing to supervise him. *Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023 (*Ortega*), a case cited by the District is, on this point, on point.

*Ortega*, as here, involved a sexual molestation, there by Joseph Ancira, a teacher employed by the Pajaro Valley Unified School District. In 1986 Ancira molested Mona Lisa Ortega, and in 1989 molested Victoria Manley,

both of whom were 12 years old. (*Ortega*, *supra*, 64 Cal.App.4th at pp. 1033–1038.) Mona Lisa (and her parents) and Victoria sued Ancira, the district, and others. (*Id.* at pp. 1036, 1041.) Ancira settled and the case went to trial against the district. (*Id.* at p. 1041.) Following a three-week trial, the jury found the district was equitably estopped from claiming a statute of limitations defense and awarded plaintiffs over $4 million in damages. (*Id.* at p. 1042.) The jury found the district 100 percent responsible for the victims' injuries. (*Ibid.*)

The district appealed, asserting several arguments, one of which was that the evidence was insufficient to support the allocation of fault (*Ortega*, *supra*, 64 Cal.App.4th at p. 1056)—an argument, as noted, the District does not make here.[2] And as to that argument—and directly applicable here—the court held that the verdict that apportioned 100 percent of the fault to the district and none to Ancira was not supported by substantial evidence. (*Ortega*, *supra*, 64 Cal.App.4th at pp. 1056–1058.) This was the analysis: "In analyzing the question of whether the evidence supports the allocation of 100 percent fault to the District, we look only to the negligence and conspiracy theories . . . . The negligence cause of action was predicated, as noted, on these theories: 'negligent supervision, negligent hiring, retention, [and] training . . . .' These negligent acts would not, and could not, have caused any injury to Mona Lisa or her father *but for* Ancira's act of sexual molestation. Ancira was the actor; the District was the facilitator. It took the two together to cause Mona Lisa's injuries. Under *John R.* [*v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438,] a school district may be liable for

_____

[2] The Court of Appeal reversed the judgment for Victoria on the basis that the evidence did not support the jury's finding of equitable estoppel as to her. (*Ortega*, *supra*, 64 Cal.App.4th at p. 1056.)

4

its own negligence in supervising and hiring a teacher who sexually abuses a student. The district may not, however, be held vicariously liable for the teacher's act of sexual misconduct. [Citation.] In this case, the jury's verdict is logically and legally irreconcilable with the evidence: If Ancira's act of sexual molestation—for which the District was not responsible—did not in any way harm Mona Lisa, then the District was not negligent in failing to supervise him more closely and in allowing him to be alone with her. With respect to the negligence finding, the matter must be remanded for a retrial on the issue of fault allocation." (*Ortega*, at p. 1057.)

Three paragraphs later, the court added its summary: "In summary, the jury's verdict is impossible to reconcile with the evidence: Ancira was responsible for some of Mona Lisa's and her father's injuries. The District acting alone could not have been responsible for all of their damages. This issue must be remanded for a new trial on fault allocation." (*Ortega, supra,* 64 Cal.App.4th at p. 1058.)

*Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125 (*Scott*) is also persuasive. The action there was by a minor, Jimmee Scott, who sued the County of Los Angeles and Zsa Zsa Maxwell, an employee of the County's department of children's services. Jimmee had been placed in the home of her grandmother, Dorothy Bullock, and the employee failed to visit the child and grandmother at least monthly as required by a Department of Social Services (DSS) regulation. Jimmee was injured when her grandmother burned her with scalding water.[3] (*Scott, supra,* 27 Cal.App.4th at pp. 136–139.) The jury found for Jimmee, and attributed fault 1 percent to her

_____

[3] In a criminal action, Bullock was convicted of two counts of child abuse and one count of inflicting corporal injury on a child. (*Scott, supra,* 27 Cal.App.4th at p. 139.)

5

grandmother, 24 percent to Maxwell, and 75 percent to the County. (*Id.* at p. 139.)

Defendants appealed and the Court of Appeal reversed the judgment with respect to the apportionment of damages, concluding that the allocation of only 1 percent of fault to the grandmother was improper as a matter of law. (*Scott, supra*, 27 Cal.App.4th at p. 147.) The court held it was reasonably likely that the special verdict form misled the jury on apportioning fault, and that the form's confusing language was prejudicial (*id.* at pp. 148–154), which, of course, is not the situation here. But the court did have some discussion that is pertinent, including this:

"4.   *Apportionment of Fault.*

"Defendants next contend that, if they are not immune from liability for Jimmee's injuries, they are at least not liable to the extent stated in the jury's verdict, which sets the County's liability at 75 percent, Maxwell's at 24 percent, and that of the apparently judgment-proof Bullock at only 1 percent. The defendants contend the jury's apportionment of fault was the result of passion and prejudice and was not supported by the evidence. The defendants also contend the jurors were confused by the special verdict form as to the manner in which fault should be apportioned among the County, Maxwell and Bullock, and therefore were unable to make a proper apportionment. We believe both contentions have merit.

"a.   *Sufficiency of the Evidence.*

"We review a jury's apportionment of fault under the substantial evidence standard and will disturb the finding only if unsupported by the evidence. [Citations.] While the evidence was plainly sufficient to support the jury's finding that the defendants' negligence was a substantial contributing cause of Jimmee's injury, we fully agree with the defendants'

6

contention that an allocation of only 1 percent of the fault to Bullock was improper as a matter of law.

"Division One of this court has recently reached a similar result in *Pamela B. v. Hayden . . . .* In that case, the plaintiff was assaulted and raped in the garage of her apartment building. A jury found the landlord's failure to provide adequate security in the garage was a legal cause of the plaintiff's injury, awarded the plaintiff $1.2 million in damages, and attributed 95 percent of the fault for her injury to the landlord, while attributing only 4 percent to the rapist and 1 percent to his aider and abettor. Announcing the result in that case, Justice Vogel pronounced the apportionment of fault 'blatantly unfair, inequitable and unsupported. . . .' ([(1994)] 25 Cal.App.4th [785,] 805[, review granted Sept. 15, 1994, S041035, review dism. Feb. 23, 1995].) The result here is similarly unsupported and unsupportable.

"We would agree that the defendants here are more culpable than the landlord in *Pamela B.* and it would not be unreasonable to find their share of responsibility for Jimmee's damages greater than that which might ultimately be imposed on Pamela B.'s landlord. That landlord, after all, was guilty at worst of a passive omission (25 Cal.App.4th at pp. 801–803), while the defendants here, acting with the authority and power of the state, delivered Jimmee into Bullock's hands, kept her there by force of law, and yet ignored other laws which were intended for Jimmee's protection and which required them to act. [(Italics omitted.)] [¶] . . .

"The relatively active role of the defendants in causing Jimmee's harm, together with their heightened duty to prevent it, is a circumstance which suggests these defendants may reasonably be found more culpable than an ordinary citizen who fails to protect another from criminal acts, and hence may reasonably be assigned a greater proportion of the blame for Jimmee's

7

harm. Still, the evidence cannot be stretched to support an apportionment of 99 percent of the fault to the negligent defendants and only 1 percent to the person who filled a tub with scalding water, lifted Jimmee into it and held her there until her flesh was burned to the bone. No reasonable jury could conclude Bullock's fault was as trifling as the jury's allocation would suggest." (*Scott, supra,* 27 Cal.App.4th at pp. 147–148.)

The verdict in *Scott* was "improper as a matter of law." It was "unsupported and unsupportable." So, too, the verdict here.

I recognize full well the fundamental principles, for example, that the parties control the litigation, and we decide the issues the parties put before us. Or that our role is not to be active but, as United States Supreme Court Chief Justice John G. Roberts, Jr. said in his oft-quoted statement during his confirmation hearings, "Judges are like umpires. Umpires don't make the rules, they apply them . . . [¶] . . . [¶] . . . it's [the judge's] job to call balls and strikes, and not to pitch or bat." (Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States: Hearing Before the Sen. Com. on the Judiciary, 109th Cong. (2005) pp. 55-56 (statement of John G. Roberts, Jr.).) I recognize too how extraordinary my position is, witness that this is something we have never done before.

That said, if what I believe should occur would occur, the District's liability would remain, as would A.H.'s $10 million verdict. The only issue that would be determined on remand is what percentage of that $10 million the District would be responsible for. As *Scott* recognizes, it could be more than Burgos. Maybe less. But whatever it is, it cannot be 100 percent.

Referring to the general rule that issues not sufficiently briefed or argued on appeal are waived, the comprehensive encyclopedia states that "**[t]he general rule that questions assigned as error are waived in the**

8

**appellate court by certain acts or omissions is not, in the light of its purpose, inflexible, and its application generally lies within the discretion of the court**." (5 C.J.S. (2024) Appeal and Error, § 993, fns. omitted, boldface added.) And in the next paragraph, it says this: "The reviewing court will be inclined to consider errors which were not sufficiently briefed or argued, where the interests of justice warrant it, that is, to prevent a miscarriage of justice. Such errors will be considered, for example, where the court's responsibility for the maintenance of a sound and uniform body of precedent warrants it, or where public welfare and public interests are involved. [¶] According to some authority, matters will be reviewed, regardless of the failure to urge them on appeal, in cases where the error assigned is fundamental or constitutes an error that is so plain that it reveals itself by a casual inspection of the record." (*Ibid*, fns. omitted.)

Perhaps some of those descriptions, if not all of them, apply here. Call the verdict fundamental error. Call it plain error. Whatever, in *Scott*'s terms, it is "improper as a matter of law." (*Scott, supra*, 27 Cal.App.4th at p. 147.) And a judgment based on it is a judgment I cannot affirm.

I add this final note. Perhaps this dissent will be used by the District to seek review in the Supreme Court. "If no petition for review is filed, the Supreme Court may, on its own motion, order review of a Court of Appeal decision . . . ." (Cal. Rules of Court, rule 8.512(c)(1).) If the District does not file a petition for review, I urge the Supreme Court to grant review on its own motion.

_____
Richman, J.

9

Court:  Marin County Superior Court

Trial Judge:  Hon. James T. Chou

Leone Alberts & Duus, Marina B. Pitts, Seth L. Gordon, for Defendant and Appellant

Corsiglia McMahon & Allard, B. Robert Allard, Mark J. Boskovich; Williams Iagmin,  Jon R. Williams, for Plaintiff and Respondent

A165493, A166684, *A.H. v. Tamalpais Union High School District*